UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FM. INDUSTRIES, INC., an Illinois Corporation<br><br>Plaintiff,<br><br>vs.<br><br>CITICORP CREDIT SERVICES, INC., a Delaware Corporation; Jeanette Brown; and John Gillard<br><br>Defendants. | **[FILED UNDER SEAL]**<br><br>C 07CV1794<br>JUDGE: CONLON<br>MAGISTRATE: DENLOW<br><br>**FILED**<br><br>APR - 2 2007  *fg*<br><br>MICHAEL W. DOBBINS<br>CLERK, U.S. DISTRICT COURT |

## C O M P L A I N T

Plaintiff, FM. INDUSTRIES, INC. ("FMI") hereinafter referred to as FMI, through undersigned counsel, allege as follows based upon personal knowledge as to the allegations concerning themselves and on information and belief as to all other allegations for its Complaint against Defendant, Citicorp Credit Services Inc ("CCSI") hereinafter referred to as CCSI, John Gillard and Jeanette Brown.

### THE PARTIES

1. Plaintiff FMI is an Illinois corporation with its principal place of business in Chicago, Illinois. FMI is in the business of developing computer software and networks that develop, collect and transmit data utilized in the debt collection industry.

2. Plaintiff, FMI is the copyright owner of the T.U.C.A.N.S. Program.

1

3. CCSI is a Delaware corporation, with its principal place of business in Kansas City, Missouri. CCSI is engaged in the business of inter alia, debt collection.

4. John Gillard is currently, Executive Vice President and Director of Recovery for Citicorp.

5. Jeanette Brown is currently, Vice President of Litigation of Citicorp.

## JURISDICTION AND VENUE

6. This is an action by FMI against CCSI for inducement of copyright infringement. The claim arises from the Copyright Act of 1976. 17 U.S.C. § 101 *et seq.* This court, therefore, has jurisdiction pursuant to 28 UL.S.C.§ 1338(a).

7. Venue is proper in the Northern District of Illinois, Easter Division pursuant to 28 U.S.C. § 1391(a).

## GENERAL ALLEGATIONS

8. FMI, a software developer, by its employees, agents, and servants, developed a software program known by its acronym, T.U.C.A.N.S, which stands for The Ultimate Collection and Network Software. T.U.C.A.N.S. is a program that is utilized in the debt collection industry.

9. FMI, by its employees, agents, and servants, also developed a computer network that allows the electronic transfer of the data developed and maintained by T.U.C.A.N.S., known as TUCNET.

10. The T.U.C.A.N.S. System provided a systematic communication interface between a large-scale debt collector, such as CCSI and the attorneys (CCSI's agents) retained by the creditor in its debt collection efforts.

11. In 2001, CCSI recognized the T.U.C.A.N.S. System could be a valuable tool to assist CCSI in its debt collection efforts. Therefore in May 2001, CCSI entered into a ten-year services

agreement (the "CCSI Agreement") with FMI, hereinafter referred to as, VSA for the Vender Service Agreement.

12. Under the terms of the CCSI Agreement, FMI agreed to continue to develop a software program designed to fit the specific needs of CCSI, as set forth in the terms of the CCSI Agreement. (A copy of the CCSI Agreement is attached hereto as Exhibit **A**).

13. Pursuant to Section 8.7, of said agreement, CCSI expressly acknowledged that FMI is the copyright owner of the system, software and related documentation and that FMI retained all right, title and interest in and to the same.

14. FMI was to "develop and maintain systems capable of allowing CCSI to systematically transfer file information from its site in Kansas City to its attorneys, (CCSI's agents) it has retained in all fifty (50) states." FMI completed this process (CCSI Agreement, ¶ 2, Exhibit **B**).

15. FMI also agreed that the system it developed and maintained for CCSI would be capable of "allowing attorneys retained by CCSI to systemically transfer file information to FMI and FMI in turn will translate and transfer such file information" to the system that CCSI had in use. (CCSI Agreement, ¶ 2, 1, Exhibit **C**).

16. The CCSI Agreement required that the collection attorneys, who were linked to CCSI through FMI via FMI's systems, sign licensing Agreements with FMI. (A sample Licensing Agreement is attached hereto as Exhibit **D**).

17. The licensing agreement was made a part of and incorporated into the CCSI agreement pursuant to Section 2.3 and referred to in Exhibit B of the CCSI Agreement.

18. Said Licensing Agreements recognized FMI's excusive ownership rights over FMI Software, FMI Systems, all materials provided under the Licensing Agreement and all FMI information, as defined in paragraph 1(K) of the CCSI Agreement.

19. The licensing Agreement also prohibited the attorneys from accessing the system after the termination of the licensing agreement and further required that the attorneys certify within 30 days that it has deleted all of FMI's software. (Licensing Agreement ¶ 4(c)(6), Exhibit **E** hereto).

20. Within a few months after the CCSI Agreement was signed, FMI implemented its systems, linking CCSI with its attorneys nationwide. During the first two years or so after the execution of the CCSI Agreement, CCSI collected over $250,000,000 of unpaid debt using FMI's T.U.C.A.N.S. and systems.

21. On July 2, 2003, over two years after the CCSI contract was signed, FMI received written notice of CCSI's desire to cancel the CCSI Agreement based on CCSI's decision to utilize a similar software system, which was designed in part by London Bridge, Inc. a company that had lured away one of FMI's executive vice-presidents being the defendant John Gillard.

22. That according to CCSI, cancellation of the VSA constituted a 'self-termination" of FMI's license agreement with CCSI's attorneys.

23. Nevertheless, in September 2003, CCSI requested permission from FMI to begin reutilizing T.U.C.A.N.S. and its systems to place accounts to their attorneys, which it did until December 2003. CCSI stopped utilizing T.U.C.A.N.S. and FMI's systems altogether on or about May 2005.

24. After CCSI stopped utilizing FMI's systems, FMI sent notice to the attorneys who were linked to CCSI via FMI's system that the FMI licensing agreements were terminated and that

4

the attorneys could; (a) no longer access the software; to bring up any information on accounts which would display data, run reports that display data, take pictures and/or screen shots that display data, and/or transfer any data that was entered into the T.U.C.A.N.S. system to any other systems or medium; (b) not copy modify or transfer the FMI software the FMI system or any FMI information; (c) not transfer possession of any copy, modification or merged portion of the FMI software, the FMI system or any FMI information; (d) to allow any person or entity to have access to or contract with FMI software the FMI system or any FMI information; (e) must delete the software from their hardware, and (f) should send written confirmation that the software had been deleted from their computers. (Termination Notice for Licensing Agreements Exhibit F hereto.)

25. After CCSI cancelled the CCSI Agreement with FMI and after the attorneys received notice of cancellation of the related Licensing Agreement, CCSI with full knowledge has encouraged, instructed and induced its collection attorneys to continue to access the T.U.C.A.N.S. system in furtherance of its collection activities and contrary to the copyright protections afforded FMI.

26. Defendant is capable of controlling the activities of their attorneys and Defendant is also aware of the illegal nature of their attorney's activities, and actively participates in, facilitates, materially contributes to, and encourages these activities, and profits from these activities by *inter alia*. The infringed information allowed the continuation of the collection of those accounts placed with the attorney.

## COUNT I

## (COPYRIGHT INFRINGEMENT PURSUANT TO 17 U.S.C. § 501, ET SEQ.)

27. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 26 as if fully set forth herein.

28. FMI has fully complied with the copyright laws and has secured the exclusive rights and privileges in and to the copyrights of T.U.C.A.N.S. The registrar of Copyrights has received FMI's registration for T.U.C.A.N.S. on February 1st, 2006, which is within 5 years of first publishing the program used by CCSI attorneys, (See Registration attached hereto as Exhibit G).

29. Defendant has infringed FMI's copyrights in T.U.C.A.N.S. encouraging and inducing the unauthorized use of T.U.C.A.N.S. in order to assist Defendant CCSI in the process of debt collection.

30. A tremendous amount of copyright infringement has taken place and continues to take place through the Defendants inducement of their attorneys, without authorization of the copyright owner, FMI, to use the FMI systems and to copy the FMI materials/information to printed or electronic form for continued use and/or reference.

31. At all relevant times, Defendant has engaged and continues to engage in the business of knowingly and systematically participating in, facilitating, materially contributing to, and encouraging the above-described unauthorized infringement of Plaintiff's copyrights and exclusive rights. Defendant has actual and constructive knowledge of the infringements committed by their attorneys.

32. By reason of the acts complained of herein, FMI has been and is being irreparably harmed and is entitled to an injunction restraining Defendants, CCSI, its officers, agents, employees and affiliates and John Gillard and Jeanette Brown from using, copying, or displaying the

T.U.C.A.N.S. System or the copy written materials/information wrongfully taken from the T.U.C.A.N.S. system. Pursuant to 17 U.S.C. § 502.

33. FMI is further entitled to recover from Defendant, the damages it has sustained and will sustain as a result of Defendant's willful misconduct, as well as the gains, profits and advantages that Defendant, obtained as a result of its wrongful acts and its costs. Pursuant to 17 U.S.C.§ 501, *et seq.*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, FMI, prays that this Court:

1. Declare that Defendant, Citigroup has infringed and induced others to infringe FMI's rights in and to the software and network;

2. Preliminarily and permanently enjoin Defendant, CCSI, its subsidiaries and affiliates and their officers, directors, agents and representatives, attorneys and all persons acting or claiming to act on its behalf or under its direction and authority from (i) copying, selling, distributing, displaying or otherwise using for any purpose the T.U.C.A.N.S. system and/or the wrongfully obtained copy written materials/information without FMI's express consent or in any other way further infringing on FMI's copyrights in T.U.C.A.N.S., (ii) engaging in any action that allows a third party to copy, sell, distribute, display or otherwise use for any purpose the T.U.C.A.N.S. system without FMI's express consent.

3. Order the impounding of all unauthorized copies of the T.U.C.A.N.S. system;

4. Order that any and all copy written materials/information be deleted from any system that said materials/information has/had been transferred to.

5. Order that CCSI immediately advise all attorneys who worked with the T.U.C.A.N.S. system of any order issued by this Court;

6. Order Defendant to file with the Court and to serve counsel for FMI, within thirty (30) days after service of this Court's order a written report and certified under oath setting forth the manner and form in which Defendant, CCSI, has complied with Court's order.

7. Award FMI its actual damages;

8. Order an accounting for the amounts recovered on behalf of the Defendant, CCSI from the unauthorized use of the T.U.C.A.N.S. systems, which is the Defendant's profit as a direct and proximate result of Defendants inducement based upon the fact that amounts recovered would be after the Defendant, CCSI, charged off the amount as a loss which would be according to the Defendant be from September 1st, 2003, in the amount of approximately $235,000,000 (pending an audit) or in the alternative according to the Plaintiff, from June 10th, 2005, in the amount of approximately $45,000,000 (pending an audit) and order such profits to be paid to FMI pursuant to 17 U.S.C. § 504(b);

9. Alternatively, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of not less then $150,000.00 for all individual infringements involved in this action which is based upon the number of individual attorney firms which is approximately forty eight (48) firms or $7,200,000.00;

10. Alternatively, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of not less then $150,000.00 for all individual infringements involved in this action which is based upon the number of individual occurrences of infringement at the transaction level which is in excess of 100,000 individual infringements or in excess of one billion dollars;

11. Award FMI punitive damages for the willful and wanton nature of Defendant's acts;

12. Award FMI interest, costs and its attorneys' fees pursuant to 17 U.S.C. § 505; and

8

13. Award such other further relief as this Court deems just and proper.

Dated: March 26, 2007

Respectfully submitted,
**FM INDUSTRIES INC**

_____
One of its Attorneys

**WAYNE RHINE**
**Attorney for Plaintiff**
**ARDC #2323990**
**500 W Madison St. #2910**
**Chicago, IL. 60661**
**Phone:  (312)474-4532**

# EXHIBIT A

# VENDOR SERVICE AGREEMENT

## Vendor Service Agreement

The parties to this Agreement are Citicorp Credit Services, Inc., a Delaware corporation with offices at 7930 NW 110th Street, Kansas City, MO 64153, a Citigroup subsidiary which shall be referred to herein as "CCSI", and FM Industries. a Illinois corporation with offices at 19th South LaSalle Street, 10th Floor, Chicago, IL 60603, which shall be referred to herein as "FMI."

## Recital

Whereas, CCSI wishes to retain the services of a third party vendor to provide systems and MIS reporting support with respect to debt collection related efforts initiated by outside collection attorneys; and

Whereas, FMI, a third party vendor capable of providing such support services, desires to provide the same to CCSI.

Now therefore, based upon the mutual terms, covenants, conditions and promises contained in this Agreement, the parties agree as follows:

Article One: Definitions
The following definitions shall apply in determining the rights and duties of CCSI and FMI set out in this Agreement.

1.1 **Litigation Management Defined:** For the purposes of this Agreement, the term "litigation management" shall mean the ability to systemically track and relay aspects, defined in Exhibit C, of the formal process and procedures related to lawsuits filed by CCSI attorneys.

1.2 **Financial Management Defined:** For the purposes of this Agreement, the term "financial management" shall mean, to the extent it can be transmitted from CCSI through the RMS system to FMI and subsequently disseminated to the appropriate attorney. Per CCSI, financial transaction information from the attorney will be sent directly to the CCSI accounts receivable system and will not pass through FMI to the RMS system. The attorneys will be required by CCSI to update the Tucans system, on a daily basis, with all financial transaction information. This information will be maintained at FMI but not transmitted to CCSI.

1.3 **Attorney Management Defined:** For the purposes of this Agreement, the term "attorney management" shall mean the ability to systemically track and manage the interface between CCSI and the collection attorneys it retains, which, at the time this Agreement is executed are approximately sixty-six (66). Such interface shall be managed by conveying file information between CCSI's RMS system and FMI's system, and between FMI's system and the Tucans system in place at the attorneys retained by CCSI. Such Tucans system, which is owned and developed by FMI, shall be provided to the attorneys retained by CCSI by FMI pursuant to a separate licensing agreement. In the course of providing such



EXHIBIT

A

EXHIBIT 4

attorney management services, FMI will provide to CCSI such reports as are outlined in Exhibit A.

1.4 Files: For the purposes of this Agreement "files" shall mean the information transmitted by FMI between CCSI and the attorneys retained by CCSI, which shall include but is not necessarily limited to: credit card account information; information related to pending and filed lawsuits; and information related to judgment, whether satisfied or unsatisfied.

1.5 Net Debt Collected. For the purposes of this Agreement the term "net debt collected" shall mean the amount of debt collected after deducting the court costs consisting of filing and service fees.

1.6 Reports: For the purposes of this Agreement "reports" shall mean information gathered by FMI and provided to CCSI in the forms specifically identified on Exhibit A attached hereto, and in any other form the parties may agree upon in the manner set out at section 2.8 of this Agreement.

1.7 Systems: For the purposes of this Agreement "systems" shall mean computer systems comprised of a central server at FMI and software (Tucans, and the export/import programs necessary to interface between the Tucans system and the RMS system), Faircom database software, the connectivity and encryption software necessary to perform the duties imposed on FMI by Article Two of this Agreement.

1.8 RMS System: For the purposes of this Agreement "RMS system" shall mean the RMS system currently in use by CCSI as of the date of this Agreement. Any modifications, refinements or upgrades made thereto during the course and term of this Agreement may require a change to the FMI system to be agreed upon as outlined in section 2.8 of this Agreement.

Article Two: Vendor Responsibilities

The purpose of this Agreement is to retain FMI to act as systemic communication interface between CCSI and the attorneys it retains to collect debt. This Agreement shall permit CCSI to send file information regarding debtors located in all fifty (50) states to FMI at one central location, and have FMI disburse such file information to collection attorneys retained by CCSI in all fifty (50) states. The Agreement is also intended to ensure that collection attorneys retained by CCSI have the ability to communicate systemically with CCSI through FMI, using systems FMI has or will develop to accomplish that specific purpose. FMI is required to track and relay file information relating to sections 1.1 through 1.3 of this Agreement in the manner required by this Article.

2.1 File Transfers: FMI shall develop and maintain systems capable of allowing CCSI to systemically transfer file information from its site in Kansas City to attorneys it has retained in all fifty (50) states. The FMI system shall also be capable of allowing attorneys retained by CCSI to systemically transfer file information to FMI, and FMI in turn will translate and transfer such file information to CCSI's RMS system. Throughout the term of this Agreement, CCSI shall have the right, based on its sole discretion, to designate the name and

location of attorneys made the subject of this Agreement.  And FMI shall provide the services required by this Agreement throughout its term.

2.2 **Systemic Conformity:** FMI presently owns and/or operates the Tucans system and CCSI presently owns or operates the RMS system.  FMI shall be responsible for conforming its systems to the RMS system, to ensure information residing on the RMS system can be systemically transferred and tracked by the Tucans system, or any other system that FMI may own or operate and choose to use from time to time.  It is understood that FMI shall conform its systems to accept and process information residing on the RMS system, and CCSI has no obligation to modify its systems to accommodate the responsibilities imposed on FMI by this Agreement.

2.3 **Attorney System:** FMI shall adapt its existing and future systems, during the term of this agreement, to be capable of transferring, maintaining and reporting on information submitted by CCSI through its RMS system to attorneys it has retained, and information submitted by said attorneys to the RMS system through FMI's Tucans systems.  FMI shall be entitled to license such Tucans software to the attorneys retained by CCSI pursuant to the form of agreement attached hereto as **Exhibit B**.  The CCSI attorneys will be required to purchase the connectivity software (i.e Connect Direct), encryption software, and the database software (Faircom) utilized by the Tucans system.  FMI agrees to facilitate the installation of all such connectivity software with CCSI attorneys.

2.4 **Code Conformity:** FMI shall, within thirty (30) days after execution of this Agreement, ensure that all the codes specified on **Exhibit C** attached hereto residing on the RMS system required to perform this Agreement have been added to and incorporated into its system.  FMI shall develop and maintain the ability to export said codes to and from all attorneys retained by CCSI throughout the course and during the term of this Agreement.  The purpose of this requirement is to enable CCSI to track information on a uniform basis using the codes currently residing on its RMS system.

2.5 **Document Conformity:** FMI's Tucan's system used by some attorneys retained by CCSI during the term of this Agreement, has the ability to add and maintain, on an individual law firm (attorney) basis,  collection and demand letters for use by attorneys retained by CCSI in all fifty (50) states; and to add and maintain pleadings, motions, affidavits, discovery documents, judgments and post-judgment execution documents for use by attorneys retained by CCSI in all fifty (50) states.  Subject to the terms of section 2.8 of this Agreement FMI shall provide the ability to store and maintain state specific uniform collection and demand letters, pleadings, motions, affidavits, discovery documents, judgements and post judgement execution documents..

2.6 **Reports:** The parties understand and agree that the information being transmitted between CCSI and its attorneys through FMI will be captured on the FMI systems.  And that FMI has the capability to compile such captured information into a variety of report formats.  Subject to the terms of section 2.8 of this Agreement, FMI shall provide reports in any format and frequency that CCSI may request

from time to time during the term of this Agreement on any matter relating to
sections 1.1 through 1.3 of this Agreement.

2.7 **Daily Transactional Capability:** All systems developed by FMI pursuant to this
Agreement, and any interface FMI systems have with the RMS system and
attorneys retained by CCSI, shall have the capability to perform the functions
required by this agreement on a daily basis.

2.8 **Change Requests:** The parties understand and agree that because this is a new
venture CCSI is expected to want changes made throughout the course and term of
this Agreement. Such changes are expected to include, but are not limited to,
requests by CCSI for different forms of reports and to add different attorneys to
the process made the subject of this Agreement. Subject to the terms of section
2.9 of this Agreement, change requests submitted by CCSI to FMI shall be
addressed in the manner set out in this section. CCSI shall submit all change
requests to FMI as a written proposal. FMI shall respond to such proposal with a
written estimation of the time and expense involved in implementing such
changes. Based on those documents, the parties hereto shall determine the extent
to which the changes proposed by CCSI shall be implemented and the cost to be
imposed on CCSI by FMI for implementing the same.

2.9 **Turn Over Requests:** The parties understand and agree that CCSI is constantly
refining and upgrading RMS and other systems owned or operated by it, which
events are referred to as a systems turn over for the purposes of this Agreement.
FMI agrees such turn over has the potential to impact the interface with the RMS
system required by this Agreement and will be negotiated under the terms of
section 2.8. FMI anticipates that the systems it provides under this Agreement will
also be undergoing changes, modifications and enhancements and will therefore,
turn over once per calendar quarter.   .

## Article Three: CCSI Responsibilities

3.1 **Compensation:** In consideration of the services to be performed pursuant to this
Agreement, CCSI agrees to pay FMI fees in the manner set out in this Agreement.
Except as otherwise specifically provided in this Agreement, CCSI shall have no
obligation to reimburse FMI for any expense it incurs in connection with its
performance of the terms of this Agreement.

3.2 **Authority:** CCSI shall obtain all necessary permission or consent to engage in the
conduct made the subject matter of this Agreement.

## Article Four: Compensation

4.1 Systems Development Expense: CCSI agrees to loan FMI the sum of One
Hundred Twenty Thousand Dollars ($120,000), in four thirty thousand Dollar
($30,000) installments. Each installment shall be transmitted from CCSI to FMI
upon successful completion of the four milestone events set out in Exhibit D
attached hereto. FMI shall repay the One Hundred Twenty Thousand Dollar
(120,000 loan as follows: four ten thousand dollar ($10,000) installments
commencing on the fifteenth (15th) day of January, 2002, and on the fifteenth
(15th) day of the month for the next three consecutive months; and then four
twenty thousand dollar ($20,000 installments commencing on the 15th day of May,

2002, and on the 15th day of each month thereafter for three consecutive months. In the event FMI fails to make timely payment of any installment, CCSI shall have the right to deduct the amount of such installment from any part of the fee owing to FMI specified in section 4.2 of this Agreement. In consideration for this interest-free loan used to develop and/or refine the systems and process made the subject matter of this Agreement, FMI agrees to the following: in the event FMI makes such systems and/or processes available to other customers, such other customers within the credit card industry shall, during the term of this Agreement, pay to FMI a higher rate of compensation than CCSI; and in the event FMI makes refinements or enhancements to the systems and/or processes made the subject matter of this Agreement, FMI will permit CCSI to use such refinements and/or enhancements for a period of six (6) before FMI will make the same available to any of its other credit card customers.

4.2 **Attorney/Litigation Management Fees**: CCSI shall pay FMI one percent (1%) of all net debt collected by CCSI attorneys using FMI's system. FMI agrees that CCSI has provided no guaranty that FMI will earn any given amount of money in performing this Agreement. CCSI retains the right to have attorneys without access to the FMI system collect debt on its behalf, and FMI shall have no claim to compensation for debt collected by any such attorneys. The pricing of this section is based on an estimate of 6,000 new accounts placed for collection each month with attorneys on the FMI system. Should such volume vary up or down by twenty percent (20%) for two consecutive months, commencing 90 days after completion of the performance and testing standards in Article Six, then either party shall be entitled to initiate a request to renegotiate the pricing set out in this paragraph. This Agreement shall continue to be performed according to its existing terms during the time any such pricing negotiations are conducted.

4.3 **Remittance**: FMI shall provide CCSI with an invoice for fees earned pursuant to section 4.2 of this Agreement at the end of each calendar month during the term of this Agreement. The invoice submitted shall be for the fees earned for the month just ended. CCSI shall remit the amount due within thirty (30) days after receiving each invoice, unless CCSI presents a good faith dispute as to the amount owing. The undisputed amount shall be paid within the aforementioned thirty (30) days. In the event the parties are unable to resolve a dispute as to any amount owing, the parties may have the dispute resolved by a court or by binding arbitration. The form of dispute resolution first selected by one of the parties shall be binding on the other.

## Article Five: Term and Termination

5.1 **Term**: The initial term of this Agreement shall be five (5) years.

5.2 **Renewal**: Within sixty (60) days prior to expiration of the initial term of this Agreement, either party may provide written notice to the other of their intent to renew the Agreement for another five (5) year term. The terms of this Agreement may be renegotiated in the renewal agreement.

5.3 **Termination Without Cause:** Either party shall be entitled to terminate this agreement for any reason by giving the other party written notice of the intent to terminate at least sixty (60) days prior to the termination date.

5.4 **Termination For Cause:** Notwithstanding any other provision in this Article Five, either party may immediately terminate this Agreement, upon verbal or written notice, in the event the other party breaches a material provision of this Agreement. A party's assessment that the other party has breached a material provision of this Agreement shall not be subject to judicial review.

5.5 **Winding Down Following Termination:** In the event this Agreement is terminated for any reason, the parties agree to cooperate to the fullest extent possible to wind down the obligations imposed by this Agreement in a manner most beneficial and least harmful to the other party. A failure to act accordingly shall constitute a breach of material provision of this Agreement.

### Article Six: Testing and Performance Standards

The testing and performance standards, and the timing relative thereto, with respect to the system FMI is required to develop regarding sections 1.1 through 1.3 of this Agreement are set out at **Exhibit E** attached hereto and incorporated herein by this reference. CCSI is under no obligation to commence performance of this Agreement until such time as FMI successfully satisfies the testing and performance standards set out in Exhibit E. The performance standards set out in Exhibit E shall include a description of the phases for rolling out the systems and processes made the subject matter of this agreement.

### Article Seven: Confidentiality

7.1 **General:** In performing the requirements of this Agreement, FMI will have access to information that is confidential and proprietary to CCSI ("Information" herein). Information may include, without limitation: (a) names, addresses, demographic and behavioral and credit information relating to actual or potential Customers of one or more Citigroup subsidiaries; and (b) marketing strategies, targeting methods, and other CCSI business objectives. FMI shall use Information only for the purpose of providing the services required by this Agreement and shall not accumulate in any way or make use of Information for any other purpose. FMI shall ensure that only its employees, authorized agents, or subcontractors who need to know Information to perform the services required by this Agreement will receive Information and that such persons agree to be bound by the provisions of this Article. Without CCSI's prior written consent, FMI may not disclose Information to any unauthorized party. FMI shall treat Information with at least the same degree of care that it treats its own confidential information and shall exercise reasonable precautions to prevent disclosure of Information to unauthorized parties. FMI shall notify CCSI immediately of any loss or unauthorized disclosure or use of Information that comes to its attention.

7.2 **Confidential Information:** All material, data and information supplied by one party to the other hereunder or supplied to either party including, but not limited to, information concerning the other party's objectives, operating procedures, financial results, computer software, other proprietary information and the terms of the Agreement are confidential and proprietary ("Confidential Information").

Confidential Information shall be used by each party solely in the performance of its obligations under, as contemplated by, this Agreement. No party shall disclose Confidential Information to any third party, except (1) as may be necessary to perform its obligations or enforce its rights pursuant to this Agreement, or (2) as otherwise required by applicable law. Without limiting the foregoing, it is acknowledged and agreed that, prior to disclosing any Confidential Information, the disclosing party shall notify the other party of the fact such disclosure will be made and the nature of such disclosure and, to the extent practicable, provide such other party with an opportunity to object to the disclosure. Each party shall take commercially reasonable steps to ensure that its officers, directors, shareholders, employees and agents take such actions as shall be necessary or advisable to preserve and protect the confidentiality of the Confidential Information. Upon written request or upon termination of the Agreement, each party shall destroy or return to the other party all Confidential Information in its possession or control, subject to each party's respective document retention policies with respect to information required to be maintained by regulatory agencies or authorities.

7.3 **Limitation:** The obligations imposed on FMI shall not apply to Information that: (a) FMI already knew; (b) FMI received from a third party that had the right to make the disclosure; (c) CCSI specifically authorizes FMI to disclose; (d) FMI developed independently; (e) becomes part of the public domain through no fault of FMI; or (f) FMI was ordered to disclose by a court or agency with appropriate jurisdiction.

7.4 **Injunctive Relief:** Both parties agrees that any unauthorized use or disclosure of Information and/or Confidential Information may cause irreparable harm to CCSI and FMI for which money damages may not constitute an adequate remedy. In that event, the parties agree injunctive relief may be appropriate.

7.5 **Use of Name:** Unless CCSI has provided prior written consent, or unless it is necessary to carry out providing the services in this Agreement, FMI shall not use CCSI's name of the name of a CCSI affiliate in any sales or advertising publication or make any public statement relating to CCSI or its affiliates.

7.6 **Privacy Promise:** All Citigroup affiliates have made a formal promise to their customers regarding the use of certain financial information. A copy of that Privacy Promise is attached hereto as Exhibit F. FMI agrees to abide by the Privacy Promise to the same extent as CCSI is otherwise required.

7.7 **Attorney Information:** It shall be necessary for CCSI to provide FMI with the names and addresses of collection attorneys currently retained. FMI specifically agrees to keep such names and addresses confidential to the same extent as if it constituted Confidential Information as defined in this Article at least until such time as the all phases of the systems and processes made the subject matter of this Agreement have been implemented as required by Exhibit E attached hereto.

7.8 **Survival:** The obligations of this Article shall survive the termination of this Agreement.

Article Eight: General

8.1 **Entire Agreement:** This Agreement, together with the attached Exhibits, shall constitute the entire Agreement between CCSI and FMI and shall supersede all prior agreements between the parties regarding the terms and subject matter set out herein. Any provision of this Agreement that is held or deemed to be invalid, illegal, or unenforceable for any reason shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions of this Agreement. The failure or delay of either party to enforce any of the provisions of this Agreement shall not be construed to be a waiver of such provision. This agreement shall be governed by and enforced pursuant to the laws of the state of Missouri.

8.2 **Audits:** In order to verify FMI's compliance with this Agreement, CCSI shall have the right to conduct quarterly reviews of FMI's performance hereunder ("Audit" herein), including compliance with respect to the confidentiality and the Privacy Promise. CCSI shall give FMI reasonable advance notice of any Audit, which shall be conducted at a time and place that is mutually agreeable and convenient to both parties. Notwithstanding the foregoing, CCSI may conduct an Audit on twenty-four (24) hour prior written or telephonic notice to FMI if CCSI reasonably believes Information has been or is about to be disclosed to in an unauthorized manner. Vendor shall cooperate fully with CCSI in any Audit and give CCSI's auditors access to its premises for that purpose. Any authorized representative of CCSI may conduct an Audit.

8.3 **Insurance:** While this Agreement is in effect, FMI shall maintain all insurance coverage required by state and federal law, including, without limitation, worker compensation and disability insurance.

8.4 **Indemnification:** Each party shall indemnify and hold harmless the other party, its corporate affiliates, and their officers, directors, employees, and agents from and against all obligations of any nature whatsoever, including all reasonable attorney fees and expert fees, resulting from a party's failure to perform in accordance with any term or conditions of this Agreement; provided, however, that the party to be indemnified notifies the other party promptly of any such claim, and such claim is not attributable to the negligent act or omission by the party to be indemnified. The other party shall make no settlement of an individual claim specifically naming or directly affecting the party to be indemnified without that party's written approval. This section shall survive the termination of this Agreement.

8.5 **Independent Contractor:** FMI shall perform this Agreement as an independent contractor, and nothing contained in this Agreement or otherwise shall be deemed to create any employment, partnership, or joint venture between FMI and CCSI. FMI acknowledges that the services to be performed pursuant to this Agreement are entirely within its control, and neither FMI nor any of its employees will hold itself or themselves out as anything other than an independent contractor to CCSI.

8.6 **Warranty and Disclaimer:** To the extent permitted by governing law, FMI warrants to CCSI that the software and processes made the subject matter of this Agreement will comply with the performance standards set out in Exhibit E attached hereto. The sole and exclusive remedy for a breach of warranty is repair

and replacement. The limited warranty set out in this section is in lieu of all other warranties, express or implied, including but not limited to the implied warranties of merchantability and fitness for a particular purpose.

8.7 License: Subject to the rights granted under this Agreement, including section 8.8 thereof, the copyright owner (FMI) of the system, software and related documentation retains all right, title and interest in and to the same, including all rights to patents, copyrights, trademarks and trade secrets in or relating to said system, software and documentation. CCSI may not translate, reverse engineer, decompile or dissemble the system. CCSI may not copy the system or software, in whole or in part, without the prior written permission of FMI, which permission shall not be unreasonably withheld; provided, however, CCSI shall be permitted to make copies of the system, software and documentation for the following purposes: (a) backup and archival consistent with CCSI's backup and archival policies and procedures; and (b) as reasonably necessary in order for CCSI to exercise the rights granted under this Agreement. Any copies of the system, software or documentation made pursuant to the preceding sentence shall include the appropriate copyright and proprietary notices. All right, title and interest in and to any enhancements or modifications made to any of the FMI system or software at the request or direction of CCSI shall be owned solely by FMI and FMI shall have the right to market and distribute such enhancements and modifications to third parties. The object code version of any such enhancements and modifications shall be deemed to be the systems and software referred to in this section and for the purposes of this Agreement.

8.8 CCSI System/Software Development: Notwithstanding section 8.7 above, it is understood by the parties that CCSI may, during the course and term of this Agreement, work to develop its own software and systems to manage the issues addressed in sections 1.1 through 1.3 of this Agreement. Such software and systems may be developed to perform the same functions performed by the FMI systems and software made the subject matter of this Agreement. The software CCSI intends to develop may include RMS software/systems or any other software/systems owned by CCSI or any of its affiliates. It is expressly understood and agreed that nothing set out in this Agreement is intended to prevent or otherwise limit the ability of CCSI to develop such software and systems through its individual and independent effort.

8.9 Damages: Neither CCSI nor FMI shall be liable for indirect, special, incidental, exemplary or consequential damages, including without limitation lost profits, related to the performance or nonperformance of this Agreement. The terms of this section are intended to include CCSI's ability or inability to use the software system arising out of any cause, including breach of contract or warranty, negligence or strict liability. And the terms of this section are intended to include any claim by FMI arising out of CCSI's efforts to develop software and systems to manage the matters set out in sections 1.1 through 1.3 of this Agreement. Under no circumstances shall the liability of either FMI or CCSI exceed the amounts paid to FMI under this Agreement.

8.10 Notices: Unless otherwise specifically provided in this Agreement, all notices, demands, instructions and other communications required or permitted to be given

to or made upon any party hereto shall be in writing and shall be sent by registered mail, postage prepaid and return receipt requested, or by overnight delivery using a system capable of verifying delivery was made, or by prepaid telegram. Unless otherwise specified in a notice in writing sent or delivered in accordance with the foregoing provisions of this section, notices, demands, instructions and other communications shall be given to or made upon the respective parties hereto at their respective addresses or fax numbers indicated below:

> Citicorp Credit Services, Inc.
> 7930 NW 110th Street
> Kansas City, MO 64153
> Fax #: 816 505 6969
> Attention: Jeanette Brown
>
> FM Industries, Inc.
> 19 South LaSalle Street
> 10th Floor
> Chicago, IL 60603
> Fax #: 312 332 2975
> Attention: Michael Friedman

In witness whereof, the parties hereto have caused this agreement to be signed on the dates shown below.

Citicorp Credit Services, Inc.

By: _____

(Stamp Name/Title)

Date: 5/1/01

FM. Industries, Inc.

By: _____

(Stamp Name/Title)

Date: 4/25/01

Exhibit A: List of Reports FMI Is Required To Provide

1). Reconciliation Process Reports for Files Sent From RMS to FMI to Attorneys

Placement File

Reconciliation/Acknowledgement of records exported by RMS and imported by FMI.

Reconciliation/Acknowledgement of records exported by FMI and imported by Attorney (utilizing Tucans).

Maintenance File

Reconciliation/Acknowledgement of records exported by RMS and imported by FMI.

Reconciliation/Acknowledgement of records exported by FMI and imported by Attorney (utilizing Tucans)

Financial File

Reconciliation/Acknowledgement of records exported by RMS and imported by FMI.

Reconciliation/Acknowledgement of records exported by FMI and imported by Attorney (utilizing Tucans)

2). Reconciliation Process Reports for Files Sent From Attorney to FMI to RMS

Maintenance File

Reconciliation/Acknowledgement of records exported by Attorney (utilizing Tucans) and imported by FMI.

Reconciliation/Acknowledgement of records exported by FMI and imported by RMS.

Note: These reports will be designed with input from CCSI and will be a rolling report indicating the number of days, to be determined by CCSI, to be displayed on the report. FMI assumes that CCSI will assist FMI in attaining any required commitment from the CCSI attorneys in order to accomplish the required reconciliation of files/records.

Exhibit B: Copy of Licensing Agreement Between FMI and Attorneys

Exhibit C: RMS Codes To Be Incorporated Into The Tucans System For The Purposes of Litigation Management

| Status Code/Exceptions | Definition and Notation Needed |
|---|---|
| *RN | Return No Assets (Date action performed) |
| *LT | Demand Letter (Date action performed) |
| *DV | Request Debt Validation (Date action performed) |
| *US | Unable to Serve (Date action performed) |
| *SF | Suit Filed and Served (Date action performed) |
| *AR | Arbitration (Date action Performed) |
| *AF | Answered Filed (Date action performed) |
| *JR | Request Judgement (Date action performed) |
| *WS | Written Stipulation (Date action performed) |
| *AJ | Active Judgement (Date action performed) |
| *VJ | Vacated Judgement (Date action performed) |
| *PA | Post Judgement Payment Arrangement (Date action performed) |
| *PG | Prior Garnishments (Date action performed) |
| *WG | Wage Garnishment (Date action performed) |
| *BG | Bank Garnishments (Date action performed) |
| *JS | Judgement Satisfied (Date Satisfied) |
| *PJ | Post Judgement Discovery (Date action performed) |
| *SA | Skipping assets (Post Judgement)(Date action performed) |
| *OG | Other Garnishments (Date action performed) |
| *BA | Broken Arrangement (Date arrangement broken) |
| *MR | Media Request from Attorney (Date requested) |
| *AV | Affidavit Request (Date attorney requested) |
| *MO | Received Media (Date attorney received) |
| *PS | Closed – Paid through Settlement (Date action performed) |
| *PC | Closed – Paid in Full – Zero Balance (Date action performed) |
| *BW | Closed – Balance Write-off (Date action performed) |
| *CD | Deceased (Date action performed) |
| *CB | Bankruptcy (Date action performed) |
| *CC | Counterclaims (Date counter claim filed) |
| *RE *RR, *RC | Returned Exhausted Efforts (date action performed) |

Exhibit D: Four Milestones That Trigger Installment Loans To FMI

1). Execution of Agreement .

2). Upon the initiation of the Phase II Test (May 21, 2001)

3). Upon initiation of the Phase III Test (June 15, 2001).

4). Upon completion of the Phase III Test (July 15, 2001)

Note: Should these milestones not be accomplished through any fault by FMI the date
shall still act as the trigger point for receipt of the funds due FMI.

Exhibit D: Four Milestones That Trigger Installment Loans To FMI

1). Execution of Agreement .

2). Upon the initiation of the Phase II Test (May 21, 2001).

3). Upon initiation of the Phase III Test (June 15, 2001).

4). Upon completion of the Phase III Test (July 15, 2001)

Note: Should these milestones not be accomplished through any fault by FMI the date shall still act as the trigger point for receipt of the funds due FMI.

Article Four: Compensation

    4.1 Systems Development Expense: CCSI agrees to loan FMI the sum of One Hundred Twenty Thousand Dollars ($120,000), in four thirty thousand Dollar ($30,000) installments. Each installment shall be transmitted from CCSI to FMI upon successful completion of the four milestone events set out in Exhibit D attached hereto. FMI shall repay the One Hundred Twenty Thousand Dollar ($120,000 loan as follows: four ten thousand dollar ($10,000) installments commencing on the fifteenth (15th) day of January, 2002, and on the fifteenth (15th) day of the month for the next three consecutive months; and then four twenty thousand dollar ($20,000 installments commencing on the 15th day of May,

Exhibit E: Testing Standards, Performance Standards and Implementation Phases

Phase I – April 23
>       FMI to receive comprehensive test files/accounts from CCSI for the internal use
>       of FMI.

Phase II – May 21
>       RMS to send placement files to FMI. FMI to reconcile files received.
>       CCSI to provide FMI with status codes to be manually entered by FMI and
>       transmitted to RMS System. FMI to reconcile with RMS system regarding the
>       number of codes/records submitted.

Phase III – June 15 Start Full System Test
>       CCSI to send placement files to FMI.
>       FMI to forward placement files to attorney (existing Tucans user)
>       Attorney to forward status codes to FMI
>       FMI to forward status codes to RMS
>       FMI to provide reports as stated in Exhibit A.

Note: In order for programming, installation and testing to be completed as stated above
and for the Tucans system to be installed at the location of the CCSI attorneys, it is
necessary for FMI to receive from CCSI a detailed explanation of the RMS records and
table of codes, naming logic for the files FMI will receive from and send to CCSI, the
company representatives for the Entrust and Connect Direct products and a list of CCSI
approved encryption software products by April 20, 2001.

The Phase II date above will be directly impacted if the Phase I date is not met.

Time is of the essence in order for FMI to install the Tucans system at each of the CCSI
attorneys within the required time frame. Therefore, it is imperative that CCSI provide
FMI, as soon as possible, a list of the selected attorneys including their name, address,
phone number and contact individual. A partial list of attorneys is expected by April
27, 2001. FMI agrees to initiate the installation and training of Tucans system upon
receipt of the list of attorneys from CCSI and will complete installation of the Tucans
system at the CCSI attorneys as follows: twenty (20) attorneys within forty-five (45)
days, and additional ten (10) attorneys within sixty (60) days and the remaining thirty
(30) attorneys within 90 days. This schedule is based on none of the attorneys requiring
significant programming changes or modifications.

Exhibit F: Privacy Promise

While information is the cornerstone of our ability to provide superior service, our most important asset is our customers' trust. Keeping customer information secure, and using it only as our customers would want us to is a top priority for all of us at Citigroup. Here, then, is our promise to our individual customers:

1. We will safeguard, according to strict standards of security and confidentiality, any information our customers share with us.
2. We will limit the collection and use of customer information to the minimum we require to deliver superior service to our customers, which includes advising our customers about our products, services and other opportunities, and to administer our business.
3. We will permit only authorized employees, who are trained in the proper handling of customer information, to have access to that information. Employees who violate our Privacy Promise will be subject to our normal disciplinary action.
4. We will not reveal customer information to any external organization unless we have previously informed the customer in disclosures or agreements, have been authorized by the customer, or are required by law.
5. We will always maintain control over the confidentiality of customer information. We may, however, facilitate relevant offers from reputable companies. These companies are not permitted to retain any customer information unless the customer has specifically expressed interest in their products or services.
6. We will tell customers in plain language initially, and at least once annually, how they may remove their names from marketing lists. At any time, customers can contact us to remove their names from such lists.
7. Whenever we hire other organizations to provide support services, we will requirement to conform to our privacy standards and to allow us to audit them for compliance.
8. For the purposes of credit reporting, verification and risk management, we will exchange information about our customers with reputable reference sources and clearinghouse services.
9. We will not use or share – internally or externally – personally identifiable medical information for any purpose other than the underwriting or administration of a customer's policy, claim or account, or as disclosed to the customer when the information is collected, or to which the customer consents.
10. We will attempt to keep customer files complete, up to date, and accurate. We will tell our customers how and were to conveniently access their account information (except when we are prohibited by law) and how to notify us about errors, which we will promptly correct.

# FM INDUSTRIES, INC.

## TUCNET & T.U.C.A.N.S.™ SOFTWARE LICENSE AND SERVICE AGREEMENT

This license and service Agreement ("Agreement") made and entered into as of this _____ of _____, 2001 by and between FM INDUSTRIES, INC an Illinois corporation with its principal place of business located at 19 S. LaSalle Chicago, Illinois (hereinafter, referred to as "FMI") and ATTORNEY NAME with its principal place of business located at ATTORNEY ADDRESS (hereinafter, referred to as "Customer").

WHEREAS:

A) This Agreement is a license agreement and not an agreement for the sale of software or services.

B) This Agreement gives Licensee limited rights to use the Software and Related Materials described below and imposes upon Licensee certain obligations to protect the Software and Related Materials from unauthorized use, reproduction, distribution or publication.

C) FMI is in the business of developing software for all aspects of the credit lending, recovery and collection industry.

D) FMI has developed certain unique computer programs and specifically as it relates to this agreement the program known as "T.U.C.A.N.S." for the credit lending, recovery and collection industry.

E) FMI also possesses certain unique and valuable Information, which it has developed for the credit lending, recovery and collection industry.

F) FMI further possess certain unique and valuable ability, related to integrating and/or interrelating its programs with other third-party software, programs, manuals, and manifestations;

G) Customer is in the Credit Lending/Credit Collection business and is desirous of using the FMI program known as "T.U.C.A.N.S." and FMI's System and Information in its business pursuant to the requirements of their client Citicorp Credit Services, Inc. (CCSI), a Delaware corporation with offices at 7930 NW 110th Street, Kansas City, MO 64153, a Citigroup subsidiary; and

H) FMI desires to provide its program "T.U.C.A.N.S" and the FMI System and Information to Customer for its business as part of FMI's requirement pursuant to their agreement with CCSI and Customer's requirements with CCSI and for no other use, in accordance with the terms and conditions (and subject to limitations) set forth herein.

Verified Page FMI: _____ Customer: _____ 1

**EXHIBIT 6**

I) It is further understood and agreed between Customer and FMI that this agreement is structured and relates solely to CCSI. Any other accounts received in the future through TUCNET on behalf of FMI's future clients that desire to use Customer's services will be governed by a separate Global License, Service and Network Agreement which may or may not incorporate in whole or in part this agreement.

J) The license contained within this Agreement shall apply to as many copies of the T.U.C.A.N.S. program in Executable form (users) that are loaded onto Customer's workstations as are requested by Customer as needed to facilitate the needs of CCSI.

NOW THEREFORE in consideration of the mutual covenants and agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Definitions. In this Agreement the following words and phrases shall have the following respective meanings, unless the context otherwise requires:

(A)    "T.U.C.A.N.S." means the existing Software that FMI has developed for the credit lending, recovery and collection industry, which is to be provided to Customer under this Agreement and which is Listed on Exhibit 1. as well as any New Releases, Enhancements or Customizations to the "T.U.C.A.N.S." Software and System.

(B)    "USER" means each individual workstation that contains the T.U.C.A.N.S Executable software, which allows each operator (Customer Employee) to access the T.U.C.A.N.S. System.

(C)    "TUCNET" for the purposes of this agreement means the Network which facilitates the movement of the accounts between Customer and CCSI and the management of same on behalf of the CCSI, the Network Client

(D)    Software" means any software from third party vendors that may be used in conjunction with the "T.U.C.A.N.S." Software in Customer's business;

(E)    "Documentation" means any materials and documents pertaining to the FMI Software as well as any New Releases/Enhancements or Customization thereto. For purposes of illustration only, documentation includes, but is not limited to, user guides, manuals, diagrams, drawings, test programs, print outs, flow charts and any other written material provided by FMI to customer pertaining to the use of the FMI Software.

(F)    "Know How" means technical information, ideas, concepts, business opportunities, Information and experience which FMI has obtained and developed though its business dealings with the credit lending, recovery and debt collection industry.

Verified Page FMI: _____ Customer: _____ 2

(G)    "Trade Secret" means, but shall not be limited, to the FMI Software and the Information defined herein, as well as related source and object codes. It shall also include, but not be limited to, sources of information, client lists, leads, drawings, designs, plans, flow charts, proposals, marketing and sales plans, financial information, costs, pricing information, and all concepts or ideas in or reasonably related to the business of FMI, as well as customer names, products, development plans, operations, technical processes, formulas, product designs, and the like, that have not previously been publicly released and which gives FMI a competitive advantage in the credit lending, recovery and debt collection industry.

(H)    "Confidential Information" means anything disclosed to Customer at any time before or after execution of this agreement relating in any way to the FMI Software, and the Information defined herein. It shall also include, but not be limited to, sources of information, client lists, leads, drawings, designs, plans, flow charts, proposals, marketing and sales plans, financial information, costs, pricing information, and all concepts or ideas in or reasonably related to the business of FMI, as well as customer names, products, development plans, operations, technical processes, formulas, product designs, and the like. NO INFORMATION CONSTITUTES CONFIDENTIAL INFORMATION IF IT IS GENERIC OR IS IN THE PUBLIC DOMAIN.

(I)    "New Releases/Enhancements" means an enhancement or modification to the FMI Software or a new module or supplementary module to function in conjunction with same, which represents the next generation of the FMI Software which FMI has decided, *in its sole discretion*, to commercially release to all its customers. It is expressly understood that New Releases/Enhancements shall not include any Customization.

(J)    "Customization" means any change, improvement or modification to the FMI Software, which is requested by a customer. FMI retains all rights and ownership to said customization and *in its sole discretion*, may elect to incorporate said customization in any FMI Software or other FMI System.

(K)    **Information shall mean, but is not limited to:**

    (1)    anything defined or described in Paragraphs A-H inclusive.

    (2)    the layout of the screens of the FMI Software or FMI System;

    (3)    the interrelatedness of the screens of the FMI Software or FMI System;

    (4)    the order and presentation of the data on the screens of the FMI Software or FMI System;

    (5)    the ability to move from screen to screen in the FMI Software or FMI System;

Verified Page FMI: _____ Customer: _____ 3

(6)    the ability to chose between and perform a variety of functions by clicking on particular items on a screen of the FMI Software or FMI System;

(7)    the forms on the FMI Software or FMI System;

(8)    the templates on the FMI Software or FMI System;

(9)    FMI's unique experience, knowledge and "Know-How," including but not limited to, its ability to interrelate and integrate the FMI Software and FMI System with other third party software, programs, manuals and manifestations;

(10)    the instructions, internal logic, internal commands, and sub-routines that are necessary for the operation or support of the FMI Software or FMI System;

(11)    FMI's technical information, ideas, concepts, business opportunities and Confidential Information;

(K)    "FMI System" means the combination of:

(1)    the FMI Software known as "T.U.C.A.N.S.";

(2)    the items defined and described in Paragraphs I. A - J, above; and

(3)    any third-party Software, programs, manual and manifestations with which (1) and/or (2) are combined and which are used in Customer's business.

(L)    "Hardware" means any computer hardware on which the FMI Software or the FMI System resides, is stored or is operated;

(M)    "Access" and or "Contact" means demonstrating, describing or explaining the FMI Software or FMI System, including the items described in paragraphs I. A-J above, to any person or entity other than Customer's employees, Customer's Client's employees or Customer's vendors and their employees, that may need or desire to review only the data on the accounts that the Customer's Client have placed with Customer, or the Customer has placed with it's vendors, and not for the purpose of reviewing the operation, functionality or logic of the FMI Software or FMI System in *any way, whatsoever, without the prior written consent of FMI.* Such consent shall not be unreasonably withheld. For purposes of illustration only, Access and/or Contact include, but is not limited to, looking at or reviewing any screens, any reports, any file listings, any module listings, or any Information, either on line or in reproduced form.

The parties expressly agree that the definitions contained herein shall include the look, feel, operation, functionality, logic and over all performance of the FMI Software or FMI System. It is also expressly agreed that the definitions will include rather than exclude the largest amount of information allowable by law.

(N) "Support" means support or assistance in the operation and maintenance of the FMI Software or FMI System, as described herein and the FMI Software Support Agreement.

(O) "Placement/Account" means an individual account received through the network known as "TUCNET" to the "T.U.C.A.N.S" System on behalf of the Credit Grantor or indebted party such as a consumer revolving credit card agreement (i.e. Visa/MasterCard), instruments and chattel paper as defined in the Uniform Commercial Code ("UCC"), commercial line agreements, commercial charge account agreements, sales memos and invoices relating thereto, and other choices in action with a singular account number or numbers but representing the total amount due customer from the initial credit receiver and or any other liable party obligated to pay under that account number or numbers.

(P) "Installation Process" means that upon execution of this agreement and within forty-five (45) days thereof, FMI shall install the "T.U.C.A.N.S" Software at Customer's site. Furthermore, FMI shall start any customization and fine tuning process needed for Customer to perform their duties in conformity with their current requirements with CCSI at no additional charge.

2. USE

(A). FMI provides the FMI Software and/or FMI System as specified herein, and licenses Customer to use it only for accounts received through TUCNET and on behalf of CCSI.

(B). The license is for use of the FMI Software and System in object or executable code form only (depending on computer system), related materials and documentation. The license also includes use of FMI's. Information.

(C). Customer understands and agrees that the FMI Software and/or FMI System, all New Releases, Enhancements and Customization, all materials provided by FMI under this Agreement, all FMI Information, as well as all FMI Software and FMI System-related intellectual property rights are and shall at all times remain the sole and exclusive property of FMI.

Verified Page FMI: _____ Customer: _____ 5

(D).   Customer understands and agrees that it obtains no rights in the FMI Software and FMI System, New Releases, Enhancements, Customization, materials provided by FMI under this Agreement, any FMI Information or FMI Software and FMI System-related intellectual property rights, other than the right to their limited use as set out in this Agreement.

3.   LICENSE:

(A)   Customer is licensed to:

(1)   use the FMI Software, the FMI System and the FMI Information solely for the internal purposes of its own business; and

(2)   copy the FMI Software, the FMI System or any FMI Information into any machine readable or printed form for backup in support of Customer's use of the FMI Software, the FMI System or the FMI Information.

(B)   Customer MAY NOT:

(1)   use, copy, modify or transfer the FMI Software, the FMI System or any FMI Information, or any copy, modification or merged portion in whole or in part, except as expressly provided for in this Agreement;

(2)   reverse engineer, de-compile, disassemble, modify, translate, or make any attempt to discover the source code of the FMI Software or the FMI System;

(3)   reverse engineer, de-compile, disassemble, modify, translate, or make any attempt to discover or otherwise unlock the Trade Secrets of FMI;

(4)   transfer possession of any copy, modification or merged portion of the FMI Software, the FMI System or any FMI Information to another party, unless it obtains FMI's prior written consent, which shall not be unreasonably withheld.

(5)   allow any person or entity other than its employees or as outlined in section 1 (L) to have access to or contact with the FMI Software, the FMI System or FMI's Information, without the prior written consent of FMI, which shall not be unreasonably withheld;

(6)   use the FMI Software, the FMI System or the FMI Information for the purpose of any business that may offer them as part of a bureau or other service to the public.
If Customer does any of the things prohibited in paragraphs 2.B. (1-6), it shall be in material breach of this Agreement and the License granted herein shall be automatically and immediately terminated, not withstanding any other remedies available.

Verified Page FMI: _____ Customer: _____ 6

4. **TERM AND TERMINATION:**

 (A) The term of this License shall commence on the date this Agreement is signed by Customer and shall remain effective until terminated, as follows:

 (B) Customer may terminate the license by:

  (1) Giving written notice to an appropriate officer or director of FMI of its intent to do so in thirty (30) days.

  (2) Customer shall return the FMI Software or System, all copies, modifications and merged portions, as well as, all manuals and documentation with said notice.

  (4) Customer shall also certify that it has deleted all FMI Software from any Hardware within thirty (30) days after it has sent the above notice of its intent to terminate this agreement. This date shall be known as the agreed termination date.

  (5) By complying with all terms as described in paragraphs 3. B 1-3 above. Customer shall only be bound to the provisions of this license agreement for a period of three (3) years from the agreed termination date. Not withstanding the aforementioned, FMI retains it rights under this agreement for actions not reasonably discoverable from the license date to three (3) years after the agreed termination date.

  (5) Customers failure to comply with these provisions in any way will obligate it to pay FMI's reasonable attorneys' fees and costs for enforcement of its rights.

 (C) FMI may terminate the license by:

  (1) Giving written notice to an appropriate officer or director of Customer of its intent to do so in thirty (30) days without cause.

  (2) Giving written notice to an appropriate officer or director of Customer of its intent to do so because;

   i. Customer has failed to comply with any of the terms and conditions of this Agreement; or

   ii. Customer has been terminated by the network's clients, with or without cause.

   iii. Customer has violated the terms of any ethical or professional standards, either as a firm or by any individual employee of Customer.

Verified Page FMI: _____ Customer: _____ 7

(3)     Notice under this sub-paragraph C. will contain reasonable specifics about the reason for the termination;

(4)     If customer receives notice from FMI with cause as outlined in section 4 subsection C (2) i, above. Customer shall have thirty (30) days from the receipt of FMI's notice of termination to correct the reason(s) for the termination to the satisfaction of FMI. Should no response be received by FMI, or should Customer not correct the reasons to the satisfaction of FMI within this thirty (30) days, termination of this license shall become effective immediately;

(5)     If customer receives notice from FMI with cause as outlined in section 4 subsection C2 ii, above, Customer shall have until the network client(s) time line has permitted

(6)     Customer shall certify that it has deleted all FMI Software from any hardware within thirty (30) days after it is sent notice of termination, assuming cure was not accomplished to the satisfaction of FMI.

(D)     Any notices under this paragraph 3 shall be hand delivered or mailed postage prepaid by certified or registered mail, return receipt requested, to an appropriate officer or director of FMI or Customer. Notice by hand delivery shall be effective upon delivery. Notice by mail shall be effective three days after the postmark date.

5.     HARDWARE:

(A)     FMI shall under no circumstances have any obligation to service or repair any Hardware, which Customer purchases in conjunction with this agreement. Rather, the manufacturer of the Hardware shall prescribe the rights regarding the Hardware for Customer. FMI agrees that if Customer purchases hardware through FMI that the Hardware and warranties will belong to Customer.

(B)     Notwithstanding the previous sub-paragraph, on any hardware obtained through FMI under this agreement, FMI will act on behalf of the Customer, at its request, and deal with the manufacturer to correct any problems that may arise which are related to the Hardware. FMI offers this service as a courtesy to the Customer. By offering this service, FMI neither assumes nor accepts any liability or responsibility for the actions of any manufacturer, their Hardware or their warranties.

Verified Page FMI: _____ Customer: _____ 8

6. **SUPPORT / CUSTOMIZATION / TRAINING:**

    (A)    Upon execution of this agreement and installation of the FMI Software, known as T.U.C.A.N.S., that is being provided at no charge for the express use of Customer for CCSI accounts received through TUCNET, Customer is entitled to and FMI shall provide support for said product, free of charge for the term of this agreement.

    (B)    During the Installation Process, training will be provided to a mutually agreeable number of Customer's employees, at no additional charge.

    (C)    FMI will replace any original defective media that is furnished by FMI, if customer notifies FMI within thirty (30) calendar days of receipt of the FMI Software.

    (F)    Any New Releases/Enhancements, Customizations, or modifications to the FMI Software or FMI System, or any other FM. System-related materials, provided by FMI to the Customer shall be subject to all conditions and restrictions contained in this Agreement, and shall at all times remain the exclusive property of FMI.

7. **PRICE:**

    (A)    There is no cost to Customer for the FMI Software or FMI System (as defined in Exhibit 1 attached hereto), not including hardware (as defined in Exhibit 2 attached hereto) pursuant to the terms of this Agreement, for the use of the Software and System in collection and service of CCSI accounts only.

    (B)    Customer shall be responsible for the cost of the communication software as defined by CCSI.

    (C)    Customer shall be responsible for the cost of the necessary Faircom server software which may be purchased through FMI. If purchased through FMI, the cost of said server software will not exceed $900.00 for each block of 8 users.

    (D)    The cost of any additional licenses for the FMI Software or FMI System requested by Customer not for the benefit of CCSI and outside the terms of this Agreement, shall be governed by a separate and distinct purchase and license agreement.

8. **SECURITY:**

    (A)    Customer agrees to observe complete confidentiality with regard to all aspects of the FMI Software and FMI System;

    (B)    Only employees on the Customer's regular payroll or as outlined in section 1.L shall be permitted access to the FMI Software and FMI System in the course of his/her employment;

(C)     Customer agrees it shall not disclose or otherwise permit any other person or entity access of any kind to the FMI Software and FMI System in any manner other than those persons as outlined in section 8 (B) above;

(D)     Customer will ensure that its employees are advised as to the confidential nature of the FMI Software and FMI System and further ensure that such employees or those persons outlined in section 1 (L) are prohibited from granting access to, disclosing, or copying any of the FMI Software or FMI System in any manner;

(F)     It is further understood that all materials in any way related to the FMI Software and FMI System will be considered confidential whether they are marked as confidential or not.

(G)     In the event Customer hires or retains any third-party person or entity not on Customer's regular payroll, and said third-party could or shall come into contact or have access to the FMI Software and FMI System:

       (1)     Customer shall inform FMI in writing at least 10 days before such access or contact takes place;

       (2)     Customer accepts sole responsibility for having such third-party sign a Confidentiality Agreement, which has been previously approved by or provided by FMI before any contact takes place;

       (3)     Customer agrees that any access or contact shall be limited to only what is necessary for such third-party to perform the duties they have been retained or contacted for and only to assess the efficiency of the FMI Software and FMI System;

       (4)     Customer agrees that anyone provided access or contact shall not be permitted to copy, modify, duplicate, enhance or customize the FMI Software or FMI System in any way whatsoever.

       (5)     In consideration of Paragraphs 8.G (1) - (4), FMI hereby specifically agrees, that a third-party may have access to the FMI Software and System only if Customer has obtained FMI's prior written approval and said third party has signed a Confidentiality Agreement, approved or provided by FMI.

(G)     FMI agrees to observe complete confidentiality with regard to all aspects of the Customer's business;

(H)     Neither Customer nor FMI shall disclose or use the Information provided from one to the other except as expressly provided for by the terms of this Agreement.

(I)     Both Customer and FMI shall take all reasonable precautions to prevent access, contact and/or disclosure or use of any such Information.

(J)     In the event of the loss of any item containing Information, Customer or FMI, as the case may be, shall promptly notify the other party in writing of such loss, describing the item and its contents

(H)     Customer agrees that it will not alter, remove, conceal or deface any, copyright, trademark or proprietary rights notice or identification which indicates the ownership of the FMI Software or FMI System or of any interest therein.

9.     <u>INJUNCTIVE RELIEF:</u>

(A)     Customer recognizes that FMI has gone to considerable time and expense to develop the FMI Software, the FMI System and related materials. Customer agrees that FMI would suffer great and irreparable harm and damage by the unauthorized copying or reproduction of the FMI Software or FMI System or the disclosure of FMI's Information. Customer further acknowledges that such actions may cause significant commercial damages, which will be difficult to assess. Therefore, Customer agrees that FMI shall be entitled to extraordinary relief in court, including but not limited to restraining orders; temporary, preliminary and permanent injunctions, without the necessity of posting bond or other security, which the Customer expressly waives, or the necessity of showing damage, which the Customer also expressly waives; for any breach of this Agreement.

10.     <u>WARRANTIES/REPRESENTATIONS/DISCLAIMERS:</u>

(A)     The services and work-product provided to Customer are original with or owned by FMI, and no portion of such services or work-product, or its use by Customer pursuant to the terms of this Agreement, violates or is protected by the right, title, interest or similar right of any third person or entity, however organized.

(B)     FMI warrants and represents that Customer shall have quiet and peaceful enjoyment of the use of the FMI Software and FMI System for the duration of this Agreement or any other agreements incorporated herein, until and unless this Agreement or any other agreements incorporated herein are properly and lawfully terminated, ended, or otherwise declared ineffective, as specified herein, or until the Agreement is breached by Customer.

(C)     FMI selected and designed the system for Customer as being an operationally efficient and appropriate integration of Hardware, Software, Enhancements, Customizations and Services with regard to Customer's Business.

(D)     Customer acknowledges that FMI shall bear no responsibility for the actions or inactions of Customer affecting or impacting upon any third party, with the exception of any express obligations made hereunder.

(E) EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT, THE SYSTEM IS PROVIDED AND LICENSED "AS IS" WITHOUT WARRANTY OF ANY KIND EITHER EXPRESS OR IMPLIED INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

(F) IN NO EVENT WILL FMI BE LIABLE TO CUSTOMER FOR ANY DAMAGES, INCLUDING LOST PROFITS, LOST SAVINGS, OR OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES, ARISING OUT OF THE USE OR INABILITY TO USE UNDER ANY THEORY WHATSOEVER.

11. GENERAL:

(A) Except as described herein, Customer will not be provided with any source code nor have access to the source code.

(B) Should Customer elect to issue a purchase order or any similar document for its own internal purposes, any conflict between the terms and conditions of the Customer's order form and this Agreement shall be resolved such that the terms and conditions of this Agreement have precedence and control.

(E) The Copyrights, Trademarks and Trade Secrets of the FMI Software, FMI System and FMI Information shall remain the property of the original owner of the Software whether FMI or third party developer. The Customer shall possess and enjoy them without owning same.

(F) As set out above, no third party enhancements are allowed to the FMI Software or the FMI System. FMI will in no way be responsible for any operating or technical difficulties that result from any unauthorized enhancements not provided by FMI.

(E) Customer may not sublicense, assign or transfer this license, the FMI Software, the FMI System or the FMI Information. Any attempt to sublicense, assign or transfer them shall be void, without FMI's prior written consent.

(F) Unless otherwise specifically provided herein, each party will be liable for any loss or damage arising from the fault or negligence of such party, its officers, employees, agents and representatives.

(G) Customer shall be responsible for all applicable federal, state, county, local or other taxes howsoever designated and whether levied or based upon the charges listed herein.

Verified Page FMI: _____ Customer: _____ 12

(H) CUSTOMER ACKNOWLEDGES THAT CUSTOMER HAS READ THIS AGREEMENT, UNDERSTANDS IT AND AGREES TO BE BOUND BY ITS TERMS AND CONDITIONS. CUSTOMER FURTHER AGREES THAT THIS AGREEMENT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN FMI AND THE CUSTOMER AS CONCERNS THE CUSTOMER'S LICENSE OF THE FMI SOFTWARE, FMI SYSTEM, OR FMI INFORMATION AND NO VARIATIONS IN THE TERMS AND CONDITIONS OF THIS AGREEMENT SHALL HAVE ANY EFFECT UNLESS AGREED TO IN WRITING IN ADVANCE BY BOTH PARTIES. THIS AGREEMENT SUPERSEDES ANY PROPOSAL OR PRIOR AGREEMENT, ORAL OR WRITTEN, OR ANY OTHER COMMUNICATION BETWEEN FMI AND CUSTOMER RELATING TO THIS AGREEMENT.

(I) FMI shall not be liable for any delays due to force majeure cause(s).

(J) The risk of loss of any materials supplied by FMI under this Agreement shall pass to the Customer upon delivery.

(K) Should any provision of this Agreement subsequently be determined to be illegal or unenforceable, said provision shall at that time be deemed omitted from this Agreement, and all other provisions shall be unaffected and shall continue in full force and effect.

(L) The headings in this Agreement are for convenience only and shall not affect the meaning or intent of any of the provisions herein.

(M) Notice(s) shall be given to the parties at their respective addresses hereinabove given as stated in the preamble of this agreement, unless any such party has given another address.

(N) This Agreement and all the duties and obligations following here-under shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, legal representatives, successors or assigns.

(O) This Agreement shall be governed by the laws of the State of Illinois. In addition, the parties agree that any litigation which arises out of this Agreement, or the relationship of the parties, shall be venued in the Circuit Court of Cook County or in the Federal Court for the Northern District of Illinois, both of which are located in Chicago, Illinois. Customer further expressly waives any objections to venue or jurisdiction in these courts and will not assert same against FMI.

WHEREFORE, in witness hereof, the parties have executed this Agreement. They further warrant and represent, that on the date of execution, their respective signatories were so authorized to act by all necessary and appropriate corporate action.


FM INDUSTRIES, INC.                          Customer


By:_____      By:_____

Title:_____    Title:_____

Date:_____    Date:_____

# FM. INDUSTRIES, INC.

## TUCNET & T.U.C.A.N.S.™ SOFTWARE LICENSE AND SERVICE AGREEMENT

### EXHIBIT 1
#### Software

## The FMI System shall include:

(A) The object or executable code version of the "T.U.C.A.N.S." program, a 32-bit Windows based software program owned and developed by FM. INDUSTRIES, INC.

(B) The consulting services of FMI's key personal at no additional charge. Said services are provided with the intent to assist Customer with their strategies either in-house or third party as it relates to the use of the FMI System and only for that purpose. The time and availability for said service is at the sole discretion of FMI.

## The FMI System does not include:

(A) Any hardware required for the operation of the "T.U.C.A.N.S." Software, such as workstations, servers, and networking equipment, which is to be provided by Customer at Customers expense or as otherwise agreed to in writing by the parties and made a part of this agreement hereto.

(B) Communication software designated by CCSI

(C) Faircom server software necessary for the operation of the FMI System.

## FM. INDUSTRIES, INC.

## TUCNET & T.U.C.A.N.S.™ SOFTWARE
## LICENSE AND SERVICE AGREEMENT

### EXHIBIT 2
### Hardware

Laser Printer (with duplexer depending on state specific legal forms)
10/100 Base-T Ethernet Network Hub

Necessary Minimal Hardware Requirements (server):

> PC SERVER installed and configured with either Windows NT 4.0 Server or
> Windows 2000 Server software
> Pentium II 450MHz Processor,
> 10-gigabyte hard drive
> 3.5 Floppy drive
> 64MB Ram Memory,
> 2MB Video Card,
> High Performance Ethernet Card,
> 24X CD Rom
> Keyboard
> Mouse
> Monitor (1024 x 768 resolution required)
> Modem
> Internet Connection

Optimal Hardware Requirements (server)

> PC SERVER installed and configured with either Windows NT 4.0 Server or
> Windows 2000 Server software
> Pentium III 800MHz Processor or higher,
> SCSI 10-gigabyte high speed (10,000 rpm) hard drive or higher and/or Raid
> configuration
> 3.5 Floppy drive
> 4mm Dat backup tape drive
> 128MB Ram Memory or higher,
> 4MB Video Card or higher,
> High Performance Ethernet Card,
> 56X CD Rom
> Keyboard
> Mouse
> Monitor (1024 x 768 resolution required)
> Modem
> High speed Internet Connection (cable or T-1)

Verified Page FMI: _____ Customer: _____ 16

## Necessary Minimal Hardware Requirements (workstation):

PC Workstation installed and configured with Windows 95,98,NT 4.0 or Windows
2000 workstation software
Pentium 200MHz Processor,
32MB Ram Memory,
4-gigabyte Hard Drive,
3.5" Floppy,
4MB Video Card,
High Performance Ethernet Card,
Keyboard
Mouse
15" Monitor (1024 x 768 resolution required)

## Optimal Hardware Requirements (server)

PC Workstation installed and configured with Windows 95,98,NT 4.0 or Windows
2000 workstation software
Pentium II 450MHz Processor or higher,
10-gigabyte hard drive
3.5 Floppy drive
64MB Ram Memory or higher,
4MB Video Card,
High Performance Ethernet Card,
56X CD Rom
Keyboard
Mouse
17" or larger Monitor (1024 x 768 resolution required)

Verified Page FMI: _____ Customer: _____ 17

## Necessary Minimal Hardware Requirements (workstation):

PC Workstation installed and configured with Windows 95,98,NT 4.0 or Windows
2000 workstation software
Pentium 200MHz Processor,
32MB Ram Memory,
4-gigabyte Hard Drive,
3.5" Floppy,
4MB Video Card,
High Performance Ethernet Card,
Keyboard
Mouse
15" Monitor (1024 x 768 resolution required)

## Optimal Hardware Requirements (server)

PC Workstation installed and configured with Windows 95,98,NT 4.0 or Windows
2000 workstation software
Pentium II 450MHz Processor or higher,
10-gigabyte hard drive
3.5 Floppy drive
64MB Ram Memory or higher,
4MB Video Card,
High Performance Ethernet Card,
56X CD Rom
Keyboard
Mouse
17" or larger Monitor (1024 x 768 resolution required)

# EXHIBIT B

Article Two: Vendor Responsibilities

The purpose of this Agreement is to retain FMI to act as systemic communication interface between CCSI and the attorneys it retains to collect debt. This Agreement shall permit CCSI to send file information regarding debtors located in all fifty (50) states to FMI at one central location, and have FMI disburse such file information to collection attorneys retained by CCSI in all fifty (50) states. The Agreement is also intended to ensure that collection attorneys retained by CCSI have the ability to communicate systemically with CCSI through FMI, using systems FMI has or will develop to accomplish that specific purpose. FMI is required to track and relay file information relating to sections 1.1 through 1.3 of this Agreement in the manner required by this Article.

**EXHIBIT**

B

# EXHIBIT C

# FILE TRANSFERS, ¶ 2, 1

2.1 File Transfers: FMI shall develop and maintain systems capable of allowing CCSI to systemically transfer file information from its site in Kansas City to attorneys it has retained in all fifty (50) states. The FMI system shall also be capable of allowing attorneys retained by CCSI to systemically transfer file information to FMI, and FMI in turn will translate and transfer such file information to CCSI's RMS system. Throughout the term of this Agreement, CCSI shall have the right, based on its sole discretion, to designate the name and

location of attorneys made the subject of this Agreement. And FMI shall provide the services required by this Agreement throughout its term.

EXHIBIT

C

# EXHIBIT D

## FM. INDUSTRIES, INC.
## TUCNET & T.U.C.A.N.S SOFTWARE
## LICENSE AND SERVICE AGREEMENT

# FM. INDUSTRIES, INC.
# TUCNET & T.U.C.A.N.S. ™ SOFTWARE
# LICENSE AND SERVICE AGREEMENT

This license and service Agreement ("Agreement") made and entered into as of this _____ of _____ by and between FM. INDUSTRIES, INC. an Illinois corporation with its principal place of business located at 19 S. LaSalle St. 10th Fl. Chicago, Illinois 60603 (hereinafter, referred to as "FMI") and _____ with its principal place of business located at_____, (hereinafter, referred to as "Customer").

**WHEREAS:**

A) This Agreement is a license agreement and not an agreement for the sale of software or services.

B) This Agreement gives Licensee limited rights to use the Software and Related Materials described below and imposes upon Licensee certain obligations to protect the Software and Related Materials from unauthorized use, reproduction, distribution or publication.

C) FMI is in the business of developing software for all aspects of the credit lending, recovery and collection industry.

D) FMI has developed certain unique computer programs and specifically as it relates to this agreement the program known as "T.U.C.A.N.S." for the credit lending, recovery and collection industry.

E) FMI also possesses certain unique and valuable Information, which it has developed for the credit lending, recovery and collection industry.

F) FMI further possess certain unique and valuable ability, related to integrating and/or interrelating its programs with other third-party software, programs, manuals, and manifestations;

G) Customer is in the Credit Lending/Credit Collection business and is desirous of using the FMI program known as "T.U.C.A.N.S." and FMI's System and Information in its business pursuant to the requirements of their client Citicorp Credit Services, Inc. (CCSI), a Delaware corporation with offices at 7930 NW 110th Street, Kansas City, MO 64153, a Citigroup subsidiary; and

H) FMI desires to provide its program "T.U.C.A.N.S" and the FMI System and Information to Customer for its business as part of FMI's requirement pursuant to their agreement with CCSI and Customer's requirements with CCSI and for no other use, in accordance with the terms and conditions (and subject to limitations) set forth herein.

**EXHIBIT**

tabbies

D

Verified Page FMI: _____ Customer: _____ 1

I)  It is further understood and agreed between Customer and FMI that this agreement is structured and relates solely to CCSI. Any other accounts received in the future through TUCNET on behalf of FMI's future clients that desire to use Customer's services will be governed by a separate Global License, Service and Network Agreement which may or may not incorporate in whole or in part this agreement.

J)  The license contained within this Agreement shall apply to as many copies of the T.U.C.A.N.S. program in Executable form (users) that are loaded onto Customer's workstations as are requested by Customer as needed to facilitate the needs of CCSI.

NOW THEREFORE in consideration of the mutual covenants and agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.  **Definitions.** In this Agreement the following words and phrases shall have the following respective meanings, unless the context otherwise requires:

(A)  "T.U.C.A.N.S." means the existing Software that FMI has developed for the credit lending, recovery and collection industry, which is to be provided to Customer under this Agreement and which is Listed on Exhibit 1, as well as any New Releases, Enhancements or Customizations to the "T.U.C.A.N.S." Software and System.

(B)  "USER" means each individual workstation that contains the T.U.C.A.N.S Executable software, which allows each operator (Customer Employee) to access the T.U.C.A.N.S. System.

(C)  "TUCNET" for the purposes of this agreement means the Network which facilitates the movement of the accounts between Customer and CCSI and the management of same on behalf of the CCSI, the Network Client

(D)  Software" means any software from third party vendors that may be used in conjunction with the "T.U.C.A.N.S." Software in Customer's business;

(E)  "Documentation" means any materials and documents pertaining to the FMI Software as well as any New Releases/Enhancements or Customization thereto. For purposes of illustration only, documentation includes, but is not limited to, user guides, manuals, diagrams, drawings, test programs, print outs, flow charts and any other written material provided by FMI to customer pertaining to the use of the FMI Software.

(F)  "Know How" means technical information, ideas, concepts, business opportunities, Information and experience which FMI has obtained and developed though its business dealings with the credit lending, recovery and debt collection industry.

(G)  "Trade Secret" means, but shall not be limited, to the FMI Software and the Information defined herein, as well as related source and object codes. It shall also

Verified Page FMI: _____ Customer: _____2

include, but not be limited to, sources of information, client lists, leads, drawings, designs, plans, flow charts, proposals, marketing and sales plans, financial information, costs, pricing information, and all concepts or ideas in or reasonably related to the business of FMI, as well as customer names, products, development plans, operations, technical processes, formulas, product designs, and the like, that have not previously been publicly released and which gives FMI a competitive advantage in the credit lending, recovery and debt collection industry.

(H)     "Confidential Information" means anything disclosed to Customer at any time before or after execution of this agreement relating in any way to the FMI Software, and the Information defined herein. It shall also include, but not be limited to, sources of information, client lists, leads, drawings, designs, plans, flow charts, proposals, marketing and sales plans, financial information, costs, pricing information, and all concepts or ideas in or reasonably related to the business of FMI, as well as customer names, products, development plans, operations, technical processes, formulas, product designs, and the like. NO INFORMATION CONSTITUTES CONFIDENTIAL INFORMATION IF IT IS GENERIC OR IS IN THE PUBLIC DOMAIN.

(I)     "New Releases/Enhancements" means an enhancement or modification to the FMI Software or a new module or supplementary module to function in conjunction with same, which represents the next generation of the FMI Software which FMI has decided, *in its sole discretion*, to commercially release to all its customers. It is expressly understood that New Releases/Enhancements shall not include any Customization.

(J)     "Customization" means any change, improvement or modification to the FMI Software, which is requested by a customer. FMI retains all rights and ownership to said customization and *in its sole discretion*, may elect to incorporate said customization in any FMI Software or other FMI System.

(K)     Information shall mean, **but is not limited to**:

   (1)     anything defined or described in Sections A-H inclusive.

   (2)     the layout of the screens of the FMI Software or FMI System;

   (3)     the interrelatedness of the screens of the FMI Software or FMI System;

   (4)     the order and presentation of the data on the screens of the FMI Software or FMI System;

   (5)     the ability to move from screen to screen in the FMI Software or FMI System;

   (6)     the ability to chose between and perform a variety of functions by clicking on particular items on a screen of the FMI Software or FMI System;

Verified Page FMI: _____   Customer: _____ 3

(7)   the forms on the FMI Software or FMI System;

(8)   the templates on the FMI Software or FMI System;

(9)   FMI's unique experience, knowledge and "Know-How," including but not limited to, its ability to interrelate and integrate the FMI Software and FMI System with other third party software, programs, manuals and manifestations;

(10)  the instructions, internal logic, internal commands, and sub-routines that are necessary for the operation or support of the FMI Software or FMI System;

(11)  FMI's technical information, ideas, concepts, business opportunities and Confidential Information:

(L)   "FMI System" means the combination of:

(1)   the FMI Software known as "T.U.C.A.N.S.";

(2)   the items defined and described in Sections 1. A - J, above; and

(3)   any third-party software, programs, manual and manifestations with which (1) and/or (2) are combined and which are used in Customer's business.

(M)   "Hardware" means any computer hardware on which the FMI Software or the FMI System resides, is stored or is operated;

(N)   "Access" and/or "Contact" means demonstrating, describing or explaining the FMI Software or FMI System, including the items described in Sections 1. A-J above, to any person or entity other than Customer's employees, Customer's Client's employees or Customer's vendors and their employees, that may need or desire to review only the data on the accounts that the Customer's Client have placed with Customer, or the Customer has placed with it's vendors, and not for the purpose of reviewing the operation, functionality or logic of the FMI Software or FMI System in *any way, whatsoever, without the prior written consent of FMI.* Such consent shall not be unreasonably withheld. For purposes of illustration only, Access and/or Contact include, but is not limited to, looking at or reviewing any screens, any reports, any file listings, any module listings, or any Information, either on line or in reproduced form.

The parties expressly agree that the definitions contained herein shall include the look, feel, operation, functionality, logic and over all performance of the FMI Software or FMI System. It is also expressly agreed that the definitions will include rather than exclude the largest amount of information allowable by law.

Verified Page FMI: _____ Customer: _____ 4

(O).   "Support" means support or assistance in the operation and maintenance of the FMI Software or FMI System, as described herein and the FMI Software Support Agreement.

(P).   "Placement/Account" means an individual account received through the network known as "TUCNET" to the "T.U.C.A.N.S" System on behalf of the Credit Grantor or indebted party such as a consumer revolving credit card agreement (i.e. Visa/MasterCard), instruments and chattel paper as defined in the Uniform Commercial Code ("UCC"), commercial line agreements, commercial charge account agreements, sales memos and invoices relating thereto, and other choices in action with a singular account number or numbers but representing the total amount due customer from the initial credit receiver and/or any other liable party obligated to pay under that account number or numbers.

(Q).   "Installation Process" means that upon execution of this agreement and within forty-five (45) days thereof, FMI shall install the "T.U.C.A.N.S" Software at Customer's site. Furthermore, FMI shall start any customization and fine tuning process needed for Customer to perform their duties in conformity with their current requirements with CCSI at no additional charge.

2.   **USE**

(A).   FMI provides the FMI Software and/or FMI System as specified herein, and licenses Customer to use it only for accounts received through TUCNET and on behalf of CCSI.

(B).   The license is for use of the FMI Software and FMI System in object or executable code form only (depending on computer system), related materials and documentation. The license also includes use of FMI's Information.

(C).   Customer understands and agrees that the FMI Software and/or FMI System, all New Releases, Enhancements and Customization, all materials provided by FMI under this Agreement, all FMI Information, as well as all FMI Software and FMI System-related intellectual property rights are and shall at all times remain the sole and exclusive property of FMI.

(D).   Customer understands and agrees that it obtains no rights in the FMI Software and FMI System, New Releases, Enhancements, Customization, materials provided by FMI under this Agreement, any FMI Information or FMI Software and FMI System-related intellectual property rights, other than the right to their limited use as set out in this Agreement.

3.   **LICENSE:**

Verified Page FMI: _____ Customer: _____5

(A)   Customer is licensed to:

   (1)   use the FMI Software, the FMI System and the FMI Information solely for the internal purposes of its own business; and

   (2)   copy the FMI Software, the FMI System or any FMI Information into any machine readable or printed form for backup in support of Customer's use of the FMI Software, the FMI System or the FMI Information.

(B)   Customer MAY NOT:

   (1)   use, copy, modify or transfer the FMI Software, the FMI System or any FMI Information, or any copy, modification or merged portion in whole or in part, except as expressly provided for in this Agreement;

   (2)   reverse engineer, de-compile, disassemble, modify, translate, or make any attempt to discover the source code of the FMI Software or the FMI System;

   (3)   reverse engineer, de-compile, disassemble, modify, translate, or make any attempt to discover or otherwise unlock the Trade Secrets of FMI;

   (4)   transfer possession of any copy, modification or merged portion of the FMI Software, the FMI System or any FMI Information to another party, unless it obtains FMI's prior written consent, which shall not be unreasonably withheld.

   (5)   allow any person or entity other than its employees or as outlined in section 1 (N) to have access to or contact with the FMI Software, the FMI System or FMI's Information, without the prior written consent of FMI, which shall not be unreasonably withheld;

   (6)   use the FMI Software, the FMI System or the FMI Information for the purpose of any business that may offer them as part of a bureau or other service to the public.

   **If Customer does any of the things prohibited in Sections 2.B. (1-6), it shall be in material breach of this Agreement and the License granted herein shall be automatically and immediately terminated, not withstanding any other remedies available.**

## 4.   TERM AND TERMINATION:

(A)   The term of this License shall commence on the date this Agreement is signed by Customer and shall remain effective until terminated, as follows:

(B)   Customer may terminate the license by:

(1)     Giving written notice to an appropriate officer or director of FMI of its intent to do so in thirty (30) days.

(2)     Customer shall return the FMI Software or System, all copies, modifications and merged portions, as well as, all manuals and documentation with said notice.

(3)     Customer shall also certify that it has deleted all FMI Software from any Hardware within thirty (30) days after it has sent the above notice of its intent to terminate this agreement. This date shall be known as the agreed termination date.

(4)     By complying with all terms as described in Sections 3. B 1-3 above, Customer shall only be bound to the provisions of this license agreement for a period of three (3) years from the agreed termination date. Not withstanding the aforementioned, FMI retains it rights under this agreement for actions not reasonably discoverable from the license date to three (3) years after the agreed termination date.

(5)     Customers failure to comply with these provisions in any way will obligate it to pay FMI's reasonable attorneys' fees and costs for enforcement of its rights.

(C)     FMI may terminate the license by:

(1)     Giving written notice to an appropriate officer or director of Customer of its intent to do so in thirty (30) days without cause.

(2)     Giving written notice to an appropriate officer or director of Customer of its intent to do so because;

    a.     Customer has failed to comply with any of the terms and conditions of this Agreement; or
    b.     Customer has been terminated by the network's clients, with or without cause.
    c.     Customer has violated the terms of any ethical or professional standards, either as a firm or by any individual employee of Customer.

(3)     Notice under this sub-Section C will contain reasonable specifics about the reason for the termination;

(4)     If customer receives notice from FMI with cause as outlined in section 4 subsection C (2) i, above, Customer shall have thirty (30) days from the receipt of FMI's notice of termination to correct the reason(s) for the termination to the satisfaction of FMI. Should no response be received by FMI, or should Customer not correct the reasons to the satisfaction of FMI within this thirty (30) days, termination of this license shall become effective

Verified Page FMI: _____ Customer: _____  7

immediately;

(5)     If customer receives notice from FMI with cause as outlined in section 4 subsection C 2b, above, Customer shall have until the network client(s) time line has permitted

(6)     Customer shall certify that it has deleted all FMI Software from any hardware within thirty (30) days after it is sent notice of termination, assuming cure was not accomplished to the satisfaction of FMI.

(D)     Any notices under this Section 4 shall be hand delivered or mailed postage prepaid by certified or registered mail, return receipt requested, to an appropriate officer or director of FMI or Customer.   Notice by hand delivery shall be effective upon delivery.  Notice by mail shall be effective three days after the postmark date.

## 5.   HARDWARE:

(A)     FMI shall under no circumstances have any obligation to service or repair any Hardware, which Customer purchases in conjunction with this agreement. Rather, the manufacturer of the Hardware shall prescribe the rights regarding the Hardware for Customer.  FMI agrees that if Customer purchases Hardware through FMI that the Hardware and Warranties will belong to Customer.

(B)     Notwithstanding the previous sub-Section, on any Hardware obtained through FMI under this agreement, FMI will act on behalf of the Customer, at its request, and deal with the manufacturer to correct any problems that may arise which are related to the Hardware.  FMI offers this service as a courtesy to the Customer.  By offering this service, FMI neither assumes nor accepts any liability or responsibility for the actions of any manufacturer, their Hardware or their warranties.

## 6.   SUPPORT / CUSTOMIZATION / TRAINING:

(A)     Upon execution of this agreement and installation of the FMI Software, known as T.U.C.A.N.S., that is being provided at no charge for the express use of Customer for CCSI accounts received through TUCNET, Customer is entitled to and FMI shall provide support for said product, **free of charge** for the term of this agreement.

(B)     During the Installation Process, training will be provided to a mutually agreeable number of Customer's employees, at no additional charge.

(C)     FMI will replace any original defective media that is furnished by FMI, if customer notifies FMI within thirty (30) calendar days of receipt of the FMI Software.

(D)     Any New Releases/Enhancements, Customizations, or modifications to the FMI Software or FMI System, or any other FMI System-related materials, provided by

FMI to the Customer shall be subject to all conditions and restrictions contained in this Agreement, and shall at all times remain the exclusive property of FMI.

## 7. PRICE:

(A)   There is no cost to Customer for the FMI Software or FMI System (as defined in Exhibit 1 attached hereto), not including hardware (as defined in Exhibit 2 attached hereto) pursuant to the terms of this Agreement, for the use of the Software and System in collection and service of CCSI accounts only.

(B)   Customer shall be responsible for the cost of the communication software as defined by CCSI.

(C)   Customer shall be responsible for the cost of the necessary FairCom® server software which may be purchased through FMI. If purchased through FMI, the cost of said server software will not exceed $900.00 for each block of 8 users.

(D)   The cost of any additional licenses for the FMI Software or FMI System requested by Customer not for the benefit of CCSI and outside the terms of this Agreement, shall be governed by a separate and distinct purchase and license agreement.

## 8. SECURITY:

(A)   Customer agrees to observe **complete confidentiality with regard to all aspects of the FMI Software and FMI System;**

(B)   Only employees on the Customer's regular payroll or as outlined in Section 1 (N) shall be permitted access to the FMI Software and FMI System in the course of his/her employment;

(C)   Customer agrees it shall not disclose or otherwise permit any other person or entity access of any kind to the FMI Software and FMI System in any manner other than those persons as outlined in Section 8 (B) above;

(D)   Customer will ensure that its employees are advised as to the confidential nature of the FMI Software and FMI System and further ensure that such employees or those persons outlined in section 1 (N) are prohibited from granting access to, disclosing, or copying any of the FMI Software or FMI System in any manner;

(E)   It is further understood that all materials in any way related to the FMI Software and FMI System will be considered confidential whether they are marked as confidential or not.

(F)   In the event Customer hires or retains any third-party person or entity not on Customer's regular payroll, and said third-party could or shall come into contact or have access to the FMI Software and FMI System:

Verified Page FMI: _____ Customer: _____ 9

(1)  Customer shall inform FMI in writing at least 10 days before such access or contact takes place;

(2)  Customer accepts sole responsibility for having such third-party sign a Confidentiality Agreement, which has been previously approved by or provided by FMI **before any contact takes place;**

(3)  Customer agrees that any access or contact shall be limited to only what is necessary for such third-party to perform the duties they have been retained or contacted for and only to assess the efficiency of the FMI Software and FMI System;

(4)  Customer agrees that anyone provided access or contact shall not be permitted to copy, modify, duplicate, enhance or customize the FMI Software or FMI System in any way whatsoever.

(5)  In consideration of Sections 8 G (1- 4), FMI hereby specifically agrees, that a third-party may have access to the FMI Software and FMI System only if Customer has obtained FMI's prior written approval and said third party has signed a Confidentiality Agreement, approved or provided by FMI.

(G)  FMI agrees to observe **complete confidentiality with regard to all aspects of the Customer's business;**

(H)  Neither Customer nor FMI shall disclose or use the Information provided from one to the other except as expressly provided for by the terms of this Agreement.

(I)  Both Customer and FMI shall take all reasonable precautions to prevent access, contact and/or disclosure or use of any such Information.

(J)  In the event of the loss of any item containing Information, Customer or FMI, as the case may be, shall promptly notify the other party in writing of such loss, describing the item and its contents.

(K)  Customer agrees that it will not alter, remove, conceal or deface any, copyright, trademark or proprietary rights notice or identification which indicates the ownership of the FMI Software or FMI System or of any interest therein.

9.  **INJUNCTIVE RELIEF:**

(A)  Customer recognizes that FMI has gone to considerable time and expense to develop the FMI Software, the FMI System and related materials. Customer agrees that FMI would suffer great and irreparable harm and damage by the unauthorized copying or reproduction of the FMI Software or FMI System or the disclosure of FMI's Information.   Customer further acknowledges that such actions may cause significant commercial damages, which will be difficult to assess. Therefore,

Customer agrees that FMI shall be entitled to extraordinary relief in court, including but not limited to restraining orders; temporary, preliminary and permanent injunctions, without the necessity of posting bond or other security, which the Customer expressly waives, or the necessity of showing damage, which the Customer also expressly waives; for any breach of this Agreement.

## 10.   WARRANTIES/REPRESENTATIONS/DISCLAIMERS:

(A)   The services and work-product provided to Customer are original with or owned by FMI, and no portion of such services or work-product, or its use by Customer pursuant to the terms of this Agreement, violates or is protected by the right, title, interest or similar right of any third person or entity, however organized.

(B)   FMI warrants and represents that Customer shall have quiet and peaceful enjoyment of the use of the FMI Software and FMI System for the duration of this Agreement or any other agreements incorporated herein, until and unless this Agreement or any other agreements incorporated herein are properly and lawfully terminated, ended, or otherwise declared ineffective, as specified herein, or until the Agreement is breached by Customer.

(C)   FMI selected and designed the system for Customer as being an operationally efficient and appropriate integration of Hardware, Software, Enhancements, Customizations and Services with regard to Customer's Business.

(D)   Customer acknowledges that FMI shall bear no responsibility for the actions or inactions of Customer affecting or impacting upon any third party, with the exception of any express obligations made hereunder.

(E)   EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT, THE SYSTEM IS PROVIDED AND LICENSED "AS IS" WITHOUT WARRANTY OF ANY KIND EITHER EXPRESS OR IMPLIED INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

(F)   IN NO EVENT WILL FMI BE LIABLE TO CUSTOMER FOR ANY DAMAGES, INCLUDING LOST PROFITS, LOST SAVINGS, OR OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES, ARISING OUT OF THE USE OR INABILITY TO USE UNDER ANY THEORY WHATSOEVER.

## 11.   GENERAL:

(A)   Except as described herein, Customer will not be provided with any source code nor have access to the source code.

(B)     Should Customer elect to issue a purchase order or any similar document for its own internal purposes, any conflict between the terms and conditions of the Customer's order form and this Agreement shall be resolved such that the terms and conditions of this Agreement have precedence and control.

(C)     The Copyrights, Trademarks and Trade Secrets of the FMI Software, FMI System and FMI Information shall remain the property of the original owner of the Software whether FMI or third party developer.  The Customer shall possess and enjoy them without owning same.

(D)     As set out above, no third party enhancements are allowed to the FMI Software or the FMI System.  FMI will in no way be responsible for any operating or technical difficulties that result from any unauthorized enhancements not provided by FMI.

(E)     Customer may not sublicense, assign or transfer this license, the FMI Software, the FMI System or the FMI Information.  Any attempt to sublicense, assign or transfer them shall be void, without FMI's prior written consent.

(F)     Unless otherwise specifically provided herein, each party will be liable for any loss or damage arising from the fault or negligence of such party, its officers, employees, agents and representatives.

(G)     Customer shall be responsible for all applicable federal, state, county, local or other taxes howsoever designated and whether levied or based upon the charges listed herein.

(H)     CUSTOMER ACKNOWLEDGES THAT CUSTOMER HAS READ THIS AGREEMENT, UNDERSTANDS IT AND AGREES TO BE BOUND BY ITS TERMS AND CONDITIONS. CUSTOMER FURTHER AGREES THAT THIS AGREEMENT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN FMI AND THE CUSTOMER AS CONCERNS THE CUSTOMER'S LICENSE OF THE FMI SOFTWARE, FMI SYSTEM, OR FMI INFORMATION AND NO VARIATIONS IN THE TERMS AND CONDITIONS OF THIS AGREEMENT SHALL HAVE ANY EFFECT UNLESS AGREED TO IN WRITING IN ADVANCE BY BOTH PARTIES. THIS AGREEMENT SUPERSEDES ANY PROPOSAL OR PRIOR AGREEMENT, ORAL OR WRITTEN, OR ANY OTHER COMMUNICATION BETWEEN FMI AND CUSTOMER RELATING TO THIS AGREEMENT.

(I)     FMI shall not be liable for any delays due to force majeure cause(s).

(J)     The risk of loss of any materials supplied by FMI under this Agreement shall pass to the Customer upon delivery.

(K)     Should any provision of this Agreement subsequently be determined to be illegal or unenforceable, said provision shall at that time be deemed omitted from this Agreement, and all other provisions shall be unaffected and shall continue in full force and effect.

(L)     The headings in this Agreement are for convenience only and shall not affect the meaning or intent of any of the provisions herein.

(M)     Notice(s) shall be given to the parties at their respective addresses hereinabove given as stated in the preamble of this agreement, unless any such party has given another address.

(N)     This Agreement and all the duties and obligations following here-under shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, legal representatives, successors or assigns.

(O)     This Agreement shall be governed by the laws of the State of Illinois.  In addition, the parties agree that any litigation which arises out of this Agreement, or the relationship of the parties, shall be venued in the Circuit Court of Cook County or in the Federal Court for the Northern District of Illinois, both of which are located in Chicago, Illinois.  Customer further expressly waives any objections to venue or jurisdiction in these courts and will not assert same against FMI.

WHEREFORE, in witness hereof, the parties have executed this Agreement.  They further warrant and represent, that on the date of execution, their respective signatories were so authorized to act by all necessary and appropriate corporate action.

**FM INDUSTRIES, INC.**                                    **Customer**

By: _____          By:_____

Title: Underline President _____          Title:_____

Date:_____          Date:_____

# FM. INDUSTRIES, INC.
## TUCNET & T.U.C.A.N.S.™ SOFTWARE
## LICENSE AND SERVICE AGREEMENT

### EXHIBIT 1
### Software

## The FMI System shall include:

(A)   The object or executable code version of the "T.U.C.A.N.S." program, a 32-bit Windows based software program owned and developed by FM. INDUSTRIES, INC.

(B)   The consulting services of FMI's key personnel at no additional charge. Said services are provided with the intent to assist Customer with their strategies either in-house or third party as it relates to the use of the FMI System and only for that purpose. The time and availability for said service is at the sole discretion of FMI.

## The FMI System does not include:

(A)   Any hardware required for the operation of the "T.U.C.A.N.S." Software, such as workstations, servers, and networking equipment, which is to be provided by Customer at Customer's expense or as otherwise agreed to in writing by the parties and made a part of this agreement hereto.

(B)   Communication software designated by CCSI

(C)   FairCom server software necessary for the operation of the FMI System.

## FM. INDUSTRIES, INC.

Verified Page FMI: _____ Customer: _____ 14

# TUCNET & T.U.C.A.N.S.™ SOFTWARE LICENSE AND SERVICE AGREEMENT

## EXHIBIT 2
### Hardware

**Laser Printer (with duplexer depending on state specific legal forms)
10/100 Base-T Ethernet Network Hub**

## Necessary Minimal Hardware Requirements (server):

PC SERVER installed and configured with either Windows NT 4.0 Server or Windows 2000 Server software
Pentium II 450MHz Processor,
10-gigabyte hard drive
3.5 Floppy drive
64MB RAM Memory,
2MB Video Card,
High Performance Ethernet Card,
24X CD ROM
Keyboard
Mouse
Monitor (1024 x 768 resolution required)
Modem
Internet Connection

## Optimal Hardware Requirements (server)

PC SERVER installed and configured with either Windows NT 4.0 Server or Windows 2000 Server software
Pentium III 800MHz Processor or higher,
SCSI 10-gigabyte high speed (10,000 rpm) hard drive or higher and/or Raid configuration
3.5 Floppy drive
4mm Data backup tape drive
128MB RAM Memory or higher,
4MB Video Card or higher,
High Performance Ethernet Card,
56X CD ROM
Keyboard
Mouse
Monitor (1024 x 768 resolution required)
Modem
High speed Internet Connection (cable or T-1)

## Necessary Minimal Hardware Requirements (workstation):

PC Workstation installed and configured with Windows 95,98,NT 4.0 or Windows 2000 workstation software
Pentium 200MHz Processor,
32MB RAM Memory,
4-gigabyte Hard Drive,
3.5" Floppy,
4MB Video Card,
High Performance Ethernet Card,
Keyboard
Mouse
15" Monitor (1024 x 768 resolution required)

## Optimal Hardware Requirements (workstation)

PC Workstation installed and configured with Windows 95,98,NT 4.0 or Windows 2000 workstation software
Pentium II 450MHz Processor or higher,
10-gigabyte hard drive
3.5 Floppy drive
64MB RAM Memory or higher,
4MB Video Card,
High Performance Ethernet Card,
56X CD ROM
Keyboard
Mouse
17" or larger Monitor (1024 x 768 resolution required)

# EXHIBIT E

# TERM & TERMINATION

# LICENSING AGREEMENT ¶ 4(c)(6)

(6)    Customer shall certify that it has deleted all FMI Software from any hardware within thirty (30) days after it is sent notice of termination, assuming cure was not accomplished to the satisfaction of FMI.

**EXHIBIT**

E

# EXHIBIT F

# TERMINATION NOTICE FOR LICENSING AGREEMENTS




*TUCNET* ™



*R.T. Advantage* ™

**Michael E. Friedman**
President

Direct Dial: (312) 474-4511

June 10, 2005

## VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED

Attorney Firm Name
Address 1
Address 2
City, State Zip

Dear Firm,

Please be advised that the FM. INDUSTRIES, INC. TUCNET & T.U.C.A.N.S. Software License and Service Agreement ("Agreement") entered into between FM. Industries, Inc. (FMI) and your firm ("you"), is hereby terminated, effective July 10, 2005, pursuant to section 4(C)(1) of the Agreement. This letter serves as the requisite thirty (30) days notice pursuant to section 4(C)(1) of the Agreement.

Pursuant to Section 2(C) of the Agreement, FMI exclusively owns the property rights to all the FMI Software, FMI System, all materials provided under the Agreement, and all FMI Information (as defined by Section 1(K) of the Agreement). Accordingly, you are prohibited pursuant to Section 3(B) of the Agreement from, among other things, the following actions:

- copying, modifying or transferring the FMI Software, the FMI System or any FMI Information (see 3(B)(1));
- transferring possession of any copy, modification or merged portion of the FMI Software, the FMI System or any FMI Information (see 3(B)(4)); or
- allowing any person or entity to have access to or contact with the FMI Software, the FMI System or any FMI Information (see 3(B)(5).

Furthermore, pursuant to Section 3(B)(4), you are prohibited from accessing the system to bring up any information on accounts which would display data, run reports that display data, take pictures and/or screen shots that display data, and/or transfer any data that was entered into the TUCANS System to any other system or medium.

EXHIBIT

F

500 West Madison ● ...cago, IL 60661 ● 1-888-TUCANS1

Similarly, the taking of any screen shots which is proprietary to FMI and/or the printing of the account narrative by pressing the print screen function of TUCANS is considered a breach of the Agreement.

It is our understanding that Citicorp Credit Services Inc., (CCSI) has recently re-sent accounts originally placed through TUCNET to licensees through their other network. As such, this constitutes a breach of FMI's agreement with CCSI. Any information contained on TUCANS and transferred in any manner to any other system constitutes a breach of your license agreement with FMI, pursuant to section 3(B)(1), and if said transfer has occurred said information must be deleted from any other system.

Moreover, pursuant to Section 4 (C)(5) you are to certify within 30 days of the date of this letter, that you have deleted all of FMI's software from your hardware. For those firms that are receiving and/or about to receive accounts from TUCNET on behalf of other client's, a new database and executable will be sent to you.

I apologize in advance for any disruption in your business that this may cause, but FMI has no choice but to protect its proprietary business information and to terminate your license agreement. If you have any questions in the interim, please do not hesitate to call me.

Very truly yours,
FM. Industries, Inc.


By: Michael Friedman
President

# EXHIBIT G

# CERTIFICATE OF REGISTRATION

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

Form TX
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

TXu 1–279–906

EFFECTIVE DATE OF REGISTRATION

FEB – 1 2006

Month    Day    Year

**SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**
THE ULTIMATE COLLECTION AND NETWORK SOFTWARE

**PREVIOUS OR ALTERNATIVE TITLES ▼**
TUCANS   T U C A N S

**PUBLICATION AS A CONTRIBUTION** if this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared   Title of Collective Work ▼

If published in a periodical or serial give   Volume ▼   Number ▼   Issue Date ▼   On Pages ▼

## 2

**a   NAME OF AUTHOR ▼**
MICHAEL E FRIEDMAN

**DATES OF BIRTH AND DEATH**
Year Born ▼ 1959   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☑ No
Pseudonymous?  ☐ Yes  ☑ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed ▼
Computer program

**b   NAME OF AUTHOR ▼**
FM INDUSTRIES, INC.

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☑ No
Pseudonymous?  ☐ Yes  ☑ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed ▼
Computer program

**c   NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed ▼

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions) For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank

## 3

**a   YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED**   This information must be given   ★2001   2006   ◀Year   in all cases

**b   DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information Month ▶   Day ▶   Year ▶
ONLY if this work has been published   ◀ Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2 ▼

MICHAEL E FRIEDMAN
4891 THORNBARK DRIVE
BARRINGTON, IL 60010

FM INDUSTRIES, INC
500 W MADISON, SUITE 2910
CHICAGO, IL 60661

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained

See instructions before completing this space

**APPLICATION RECEIVED**
FEB 0 1 2006
**ONE DEPOSIT RECEIVED**
FEB 0 1 2006
**TWO DEPOSITS RECEIVED**

**FUNDS RECEIVED**

DO NOT WRITE HERE
OFFICE USE ONLY

**EXHIBIT**

G

**MORE ON BACK ▶**   • Complete all applicable spaces (numbers) on the reverse side of this page.
• See detailed instructions

DO NOT WRITE HERE
Page 1 of ___ pages

FORM TX

EXAMINED BY ☐ ORM

CHECKED BY

☐ CORRESPONDENCE
☐ Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

*Amended by C.O. from phone call to MICHAEL E.
FRIEDMAN on May 22, 2006.

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼

a ☐ This is the first published edition of a work previously registered in unpublished form

b ☐ This is the first application submitted by this author as copyright claimant

c ☐ This is a changed version of the work, as shown by space 6 on this application

If your answer is "Yes," give Previous Registration Number ▶          Year of Registration ▶

**5**

**DERIVATIVE WORK OR COMPILATION**
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates ▼

**a**

**6**

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed ▼

**b**

See instructions
before completing
this space

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                    Account Number ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent  Name/Address/Apt/City/State/ZIP ▼

MICHAEL E FRIEDMAN / 500 W MADISON / SUITE 2910 / CHICAGO / IL 60661

**b**

Area code and daytime telephone number ▶ 312-474-4511          Fax number ▶ 312-474-0762

Email ▶ MIKEF@TUCANS.COM

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

☑ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____

Check only one ▶

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date

MICHAEL E. FRIEDMAN          Date ▶ 01/30/06

Handwritten signature (X) ▼

X _____

Certificate
will be
mailed in
window
envelope
to this
address:

Name ▼
MICHAEL FRIEDMAN

Number/Street/Apt ▼
500 W MADISON, SUITE 2910

City/State/ZIP ▼
CHICAGO, IL 60661

**9**

• Complete all necessary spaces
• Sign your application in space 8

1 Application form
2 Non-refundable filing fee in check or money
  order payable to Register of Copyrights
3 Deposit material

Library of Congress
Copyright Office · TX
101 Independence Avenue, S E
Washington, D C 20559-6222